**FILED** A-R

**JUNE 30, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT



RECEIVED

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JUN 19 2008

JUN 19 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| United States of America ex rel. | ) |
| Mr. Darryl Washington | ) |
| | ) |
| (Full name and prison number) | ) |
| (Include name under which convicted) | ) |
| | ) |
| PETITIONER | ) CASE NO: _____ |
| | ) (Supplied by Clerk of this Court) |
| vs. | ) |
| | ) 08CV3521 |
| Mr. Gerardo Acevedo | ) JUDGE CASTILLO |
| (Warden, Superintendent, or authorized | ) MAG. JUDGE NOLAN |
| person having custody of petitioner) | ) |
| | ) |
| RESPONDENT, and | ) |
| | ) |
| **(Fill in the following blank only if judgment** | ) |
| **attacked imposes a sentence to commence** | ) |
| **in the future)** | ) |
| | ) |
| ATTORNEY GENERAL OF THE STATE OF | ) Case Number of State Court Conviction: |
| Illinois | ) |
| Lisa Madigan | ) |
| (State where judgment entered) | ) _____ |

### PETITION FOR WRIT OF HABEAS CORPUS -- PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: Criminal Court Of Cook
County, Illinois 2650 South California, Avenue

2. Date of judgment of conviction: September 9-1997

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
First Degree Murder, Home Invasion, and Aggravated battery with a
firearm

4. Sentence(s) imposed: Sixty six years

5. What was your plea? (Check one)
   (A) Not guilty (X)
   (B) Guilty ( )
   (C) Nolo contendere ( )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

1.

## PART I -- TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):    Jury ( X )    Judge only (  )

2. Did you testify at trial?    YES (  )    NO    (X)

3. Did you appeal from the conviction or the sentence imposed?    YES ( X )    NO (  )

    (A)  If you appealed, give the

        (1) Name of court:  Appellate Court Of Illinois First Judicial Dist.

        (2) Result:  Affirmed

        (3) Date of ruling:  June 14-1999

        (4) Issues raised:  Police lacked probable cause for his arrest
and being denied a   fair Trial, and a bogus Identified by a

    (B)  If you did not appeal, explain briefly why not:

4. Did you appeal, or seek leave to appeal, to the highest state court?    YES (X )    NO (  )

    (A)  If yes, give the

        (1) Result    Denied

        (2) Date of ruling:

        (3) Issues raised:

    (B)  If no, why not:

5. Did you petition the United States Supreme Court for a writ of *certiorari*?    Yes (  )    No (  )

    If yes, give (A) date of petition:  5-1-2000    (B) date *certiorari* was denied:  June 12-2000

2

On June 20-1993, Mr. Darryl Washington, was cut in the left arm
and amided in the Cook County Hospital, for sixty stiches in his
left arm.

And on August 23-1993, Mr. Darryl Washington, was amided in Saint
Elizabeth Hospital, for a gun shot wound to his Right shoulder
these medical records and doctors statements would clearly verified
that Mr. Darryl Washington, could not have shot anyone on December
5-1993,.

And failing to INTERVIEW NAYATI JOHNSON, ZURIEL JOHNSON, and Mr.
ROBERT WILLHITE, who was arrested in the alley right behind the
building where this incident occurred shortly after these individuals
was shot, with guns that was found in the car that all three of
these individuals was arrested in.

And failing to correctly question Ms. Ramos, about her identification
of Mr. Washington, in open court.

AND COUNSEL'S FAILURE TO PROPERLY PROPARE FOR TRIAL BEFORE TRIAL.

And Ineffective Assistance Of Appellate Counsel, for Failure to
argue on appeal that the police did not have probable cause to
arrest him because Mr. Darryl Washington, ia " ACTUAL INNOCENCE ".

2-B.

## PART II -- COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES (X)   NO ( )

With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

A.   Name of court:   Criminal Court Of Cook County Illinois

B.   Date of filing:  June 5-2000, & Supplemental on March 9-2004.

C.   Issues raised:  Ineffective Assistance Of Trial Counselor, and failing to subpoena Doctor, Medical Records from two different Hospitals along with everything else.

D.   Did you receive an evidentiary hearing on your petition?    YES ( )   NO (X)

E.   What was the court's ruling?  Denied as being frivolous and patently without marit.

F.   Date of court's ruling: October 24-2005

G.   Did you appeal from the ruling on your petition?    YES (X)   NO ( )

H.   (a) If yes,   (1) what was the result?   Denied

(2) date of decision:   October 26-2007

(b) If no, explain briefly why not:

I.   Did you appeal, or seek leave to appeal this decision to the highest state court?

YES (X)  NO ( )

(a) If yes,   (1) what was the result?   Denied

(2) date of decision:   March 26-2008

(b) If no, explain briefly why not:

3

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?     YES ( )        NO (χ )

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1. Nature of proceeding     _____

        2. Date petition filed     _____

        3. Ruling on the petition     _____

        3. Date of ruling     _____

        4. If you appealed, what was
           the ruling on appeal?     _____

        5. Date of ruling on appeal   _____

        6. If there was a further appeal,
           what was the ruling ?     _____

        7. Date of ruling on appeal   _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?
        YES ( )   NO (χ )

    A. If yes, give name of court, case title and case number: _____

_____

    B. Did the court rule on your petition?  If so, state

        (1) Ruling: _____

        (2) Date: _____

#### 4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?

**YES ( )   NO ( )**

If yes, explain: _____

_____

4

**PART III -- PETITIONER'S CLAIMS**

1.  State <u>briefly</u> every ground on which you claim that you are being held unlawfully.  Summarize <u>briefly</u> the <u>facts</u> supporting each ground.  You may attach additional pages stating additional grounds and supporting facts.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A)  Ground one    Ineffective Assistance Of Trial Counsel, for
Supporting facts (tell your story <u>briefly</u> without citing cases or law):

failing to investigate the three individuals that was arrested

on December 6-1993, in the alley right directly behind the

building where this incident occurred, Because one of the three

was the brother of Pierre Willhite, who was arrested with two 25

automatic handguns which may have been the murder weapon in this

case...


(B)  Ground two    Ineffective Assistance Of Trial Counsel, Because he
Supporting facts:
failed to subpoena Doctors, and Medical Records from the Cook

County Hospital, and the Saint Elizabeth Hospital, that is

" EXCULPATORY "  because it would have verified that Mr. Darryl

Washington, could not have been involved with this incident

because of his own medical injurys at the time of this incident.

5

(C)  Ground three   The police arrest was unconstitutional and illegal
Supporting facts:

because they did not have **PROBABLE CAUSE TO ARREST THE PETITIONER**

**Darryl Washington.**

And the **BOGUS AND VERY ILLEGAL IDENTIFICATION MADE AGAINST THE**

**PETITIONER Darryl Washington.**

And being denying a fair and impartial trial, because the Trial

Judge was **prejudice against Darryl Washington, in denying his**

**Motion To Quash Arrest, as well as many other issues.**

(D)  Ground four
Mr. Supporting facts: Washington, has been denied a fair Direct Appeal,

because of the Ineffective Assistance Of Appellate Counsel,

failure to raise his " **TRUE AND CORRECT CONSTITUTIONAL CLAIMS ON**

**DIRECT APPEAL, CLAIMS LIKE " ACTUAL INNOCENCE " as well as**

**MANY OTHERS...     LIKE THE BOGUS IDENTIFICATION "..**

2   Have all grounds raised in this petition been presented to the highest court having jurisdiction?
    YES ( )  NO (X )

3.  If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:

Because of the constitutional Ineffective Assistance Of Appellate

Counsel, **failure to raise " ACTUAL INNOCENCE ", AND A BOGUS AND**

**ILLEGAL IDENTIFICATION, CONCERNING PETITIONER Darryl Washington,**

**being involved with this case whatsoever...**

6

## PART IV -- REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing _____

(B) At arraignment and plea _JAMES   MULLENIX_____

(C) At trial _____JAMES   MULLENIX_____

(D) At sentencing _____James  MULLENix_____

(E) On appeal _____R.H.R.  SIlvertRust_____

(F) In any post-conviction proceeding _WINONA J. AgbabiaKa_____

(G) Other (state): _____

## PART V -- FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( X )

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____

X   WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _6 -12 -08_
(Date)

_____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_E Darryl Washington_
(Signature of Petitioner)

_K62037_____
(I.D. Number)

_____
(Address)

REVISED 01/01/2001

7

## STATEMENT OF FACTS FROM STATE COURTS

this petitioner, Darryl Washington, was arrested on January 20-1994, and charged with first degree murder, home invasion, and aggravated battery with a firearm. Following a jury trial before the Honorable Thomas Hett, a jury found the petitioner guilty of first degree murder, home invasion, and aggravated battery with a fireare. The court then sentenced the petitioner to sixty six years in the Illinois Department Of Corrections. At all times Mr. Darryl Washington, was represented by Assistant Public Defender James D. Mullenix,.

Now seven days after being released from the hospital Louis Cruz, allegedly **told detective March, that he heard from other individuals**

**in the neighborhood that " Scooter " " Gooch " " and " Pierre "**

**WERE THE SHOOTERS AND THAT THEY HUNG OUT IN THE Wicker Park area**

**on the wast side of Chicago.**

Detective March, called the Wicker Park, area police who checked their files for the nick names and learned that " Scooter " was " Darryl Washington, who had a criminal history record and photograph on file which was subsequently used in a five photograph, Photo array's and was shown to Ms. Sylvia Ramos, one of the victims / witnesses whom had also been inside of the apartment when the shooting occurred..

Viewing the photo array after the shooting took place, Ms. Sylvia Ramos, did not positively identify Mr. Darryl Washington, as being one of the shooters.

Also viewing this same photo array was Edgar Perez, a witness whom had seen the shooter on the way up the stairs, moments before the shooting, Perez, did not identify Darryl Washing, as being one of the individuals he seen on the stairs, But stated that Mr. Washington, was a associate of Mr. Pierre, Willhite, whom was identified as one of the shooters.

Viewing the photo array was Ms. Obedine Valentine, the home owner and eye witness to the shooting and she did not identify Mr. Darryl. Washing, as one of the individuals involved with the shooting and home invasion.

On January 20-1994, Mr. Washington, was placed under arrest, at
Wicker Park Fieldhouse, by officers Echevarria and Motzny,
concerning a stop order by the Chicago Police Department, concerning
Detective March, investigation into a Murder, Home Invasion, and
Aggravated battery with a firearm, committed on December 5-1993,
at approximate 6:30 P.M?. But officer Echevarria, admitted that
at the time he arrested Mr. Washington, **He was not violating any
laws nor was their any arrest warrant issued for him.**
Prior to trial, Mr. Washington, moved to **QUASH THE ILLEGAL ARREST**
and the results of a line-up he was placed in immediately there-
upon his bogus arrest, Based on the grounds that said arrest was
made without **PROBABLE CAUSE, and that the STOP ORDER obtained by
Detective March, and used by officers Echevarria, and Motzny, as
the basis for Mr. Washington's, ILLEGAL ARREST, KIDNAP, and
DEPLORABLE DETAINMENT, WAS IN ITSALF BOGUS BECAUSE Mr. Washington
was not involved with that above mention incident whatsoever,**
" This Motion was denied "..
At trial it was revealed that one hour before the shooting took
place, Pierre Willhite, and Elvis Valentine, ( The son of Ms.
Obedina Valentine, had an altorcation inside of the building on
the stairs, ) " The altercation started when Elvis Valentine, hit
Pierre, in his face." **Mr. Washington, was not with Pierre Willhite
when this fight happen ".**

Ms. Sylvia Ramos, also testifided at the trial of Darryl Washington
and affirmed that when she viewed the photo array's at the
request of Detective March, she was unsure that Mr. Washington
had been one of the individuals involved, She further testified
that only **one person entered the apartment and began shooting.**
When asked to described this person, Ms. Ramos, could only state
( WELL ), I know he was dark, BLACK. " And when asked to make an
in court identification of the person whom she saw enter the
apartment and shoot, **Ms. Ramos, twice identified Mr. Pierre
Willhite, as the shooter "... Then Ms. Ramos, was allowed to
leave the Court Room out of the vision of the jury and Mr.
Washington's trial attorney, to be coerce by the prosecutor to
give false testimony and a in court identification of Mr. Wash-
ington, after being shown photographs by the prosecutors and told**

9.

to pick Mr. Washington, out in open court, after a third opportunity to identify Mr. Washington.

Edgar Perez, also testified at trial that only **one person entered the apartment and began shooting.**

Mr. Perez, however, identified **Mr. Pierre Willhite, as the shooter his prior statements to police that Mr. Washington, was not one of the men he seen on the stairs moments before the shooting.**

Mr. Sam Williams, an off duty security guard who knew Mr. Washington, and was in the vicinity of the shooting when it took place also testified that he had saw men fleeing from the buildin g and Mr. Washington, **was not one of those individuals.**

In addition to claiming that he was innocent, petitioner claimed that the Trial Judge engaged in conduct that was prejudicial to the administration of justice. Petitioner listed several areas of prejudice, including his being denied any opportunity to cross-examine witnesses as to Ms. Ramos, first statement to the police because she never said that she saw a scar on Mr. Washington, nose as she testified to in court at petitioner's trial after she was coerced by the prosecutors.

Nor would petitioner Trial Attorney, or Prosecutors, subpoena several " Doctors, Medical Records from the Cook County Hospital, concerning Mr. Washington, injury on June 20-1993, of his left arm, and to clearly verify that Mr. Darryl Washington, received approximate sixty stiches in his left arm, The petitioner trial attorney should have but failed to do so, As well as subpoena several Doctors and Medical Records, from Saint Elizabeth Hospital for a gun shot wound to his " Right Shoulder " Because these doctors and medical records is EXCULPATORY IN ITS NATURE because they would have revealed that the petitioner Darryl Washington, could not have been involved in said incident because on August 23-1993, Mr. Darryl Washington, was shot in his right shoulder, making both of his arms **unusable on December 5-1993,** approximate three months after this gun shot to his right shoulder, And five months after the injury to his left arm which had sixty stiches in it, Please see ( R.E-130 ) to ( R.-E-133 ).

The trial court denied the Motion For A New Trial. The Court
subsequently sentenced petitioner to sixty six years for first
degree murder, home invasion, and aggravated battery with a
firearm. Petitioner appealed his conviction and sentence, Petit-
ioner claimed that the trial court erred when it denied his
Motion To Quash Arrest, and erred when it denied petitioner,
Motion To Sever, and Motion To Reconsider The Motion To Sever,
and erred in denying the petitioner Motion In Limine, within
petitioner Motion For A New Trial, and on Direct Appeal, petition-
er Appellate Counselor arguments was the police lacked probable
cause for his arrest, and that he was denied a fair trial because
of the prosecutor's highly inflammatory closing argument, In a
Rule (23) order filed on June 14-1999, the Illinois Appellate
Court, found that the trial court order was affirmed. As part of
their order, they ordered  for each defendant to pay one hundred
dollers as costs for the state's defending this appeal.
Petitioner filed a Post Conviction Petition on June 5-2000, and
Supplemental Petition For Post Conviction filed on March 9-2004,
claiming Ineffective Assistance Of Trial Counsel and Direct
Appeal Counsel. Where appointed counselors failed to subpoena,
doctors, medical records and other witnesses and evidence which
is exculpatory in nature See ( R.-E-130) to ( R.-E-133).
As a matter of Due Process Of Law under the 14TH Amendment to the
United States Constitution, one of the fundamental due process
rights is the right to present witnesses in one's defense " ( See
eg. Washington vs. Texas 388 U.S. 14, 19, 87 S.Ct. 1220, 1923, 18
L. Ed. 2d. 1019, 1023)( 1967), " the direct restriction on the
scope of cross-examination denied the petitioner the right of
effective cross-examination it would be constitutional error of
the first magnitude and no amount of showing of want of prejudice
would cure it " ( See e.g. Brookhart vs. Janis 384 U.S. 1,3 ) The
manifest weight of the United States Supreme Court's interpretat-
ions of the Due Process Clause of the 14TH Amendment, as demonstrated
herein, is that criminal defendant's will be immune from punish-
ment if they are not allowed to present evidence in their defense
or denied opportunity to effectively cross-examine witnesses
Under this light, it is evidence that petitioner Washington, was

11.

deprived due process of Law when the appellate court, despite

petitioner's claims of actual innocence and that he objected to
the aforestated issues not being raised sooner by appointed
counselors who was placed on petitioner case by the Trial Court,
and Appellate Court, But would not raise petitioner true and
correct constitutional claims on Direct Appeal.

Equally important, the post-conviction petition court was duty
bound to accept petitioner Washington's allegation, in total, as
true in summeriliy dismissing his pro,se post- conviction petition
( See e.g. People vs. Coleman 701 N.E. 2d. 1063, 183 Ill. 2d. 366
(1998) ( all well pleaded facts are to be taken as true at this
point in the proceedings). Taken as true petitioner Washington's
allegations supporting affidavits and evidence of his actual
innocence would render the post-conviction court's application or
order of frivolous and patent without merit ruling, manifestly
erroneous as it violates the doctrine of personal guilt which
prevents the persecution of the innocent for the beliefs and act-
ions of others ( See e.g. Bridges vs. Wixon 65 S. Ct. 1443, 326
U.S. 135 ( 1945) at 65 S. Ct. 1456-57) (" The doctrine of personal
guilt is one of the most fundamental principles of our jurisprud-
ence. It partakes of the very essence of the concept of freedom
and due process of law,. It prevents the persecution of the
innocent for the beliefs and actions of others" ) and the United
States Supreme Court's decision in Herrera vs. Collins, " NO
PERSON CONVICTED OF A CRIME SHOULD BE DEPRIVED OF LIFE OR LIBERTY
GIVEN COMPELLING EVIDENCE OF ACTUAL INNOCENCE ( See e.g. Herrera
vs. Collins 506 U.S. 390, 113 S.Ct. 853, 122 L.E d 2d. 203 )
(1993) ( at Herrera 506 U.S. 413 ). Superior authority of the
United States Constitution demonstrates that the appellate court
was manifestly erroneous in its conclusion that the trial court's
summary dismissal of petitioner's post- conviction petition was
proper ". Such summary dismissal, after taking as true, that
petitioner Washington is actually innocent of the crime in which
he standd convicted and imprisoned for was not proper but rather
a **fundamental miscarriage of justice,**which under federal law
would excuse the application of the procedural bar. ( See e.g.
Sawyer vs. Whitley 505 U.S. 333, 112 S.Ct. 2514, 120 L. Ed. 2d.

269)(1992)(" In order to demonstrate a miscarriage of justice to
excuse the application of the procedural bar petitioner must show
actual innocence " ) " Please see medical records from the Cook
County Hospital, and Saint Elizabeth Hospital " ) . ( " No state
shall deprive any person of life, liberty, or property without
due process of law " ) this court has an overriding duty to
preserve and follow the United States Constitution (See e.g.
Idaho vs. Coerd; Alone Tribe of Idaho 117 S.Ct. 2028)(1997)(at
117 S.Ct. 2037) (" It is the right and duty of the states within
their own judiciaries to interpret and follow the constitution.
The seperate states and the Government of the United States are
bound in the common cause of preserving the whole constitutional
order"), Which requires this Court to reverse the Illinmis Supreme
Court, in the present cause of action. Or special significance,
had the Illinois Supreme Court, been focuced upon the fastibions
regard for the honor of the administration of justice, as is
constitutionally required (See e.g. Communist Party vs. Subversive
Activities Confrol BOARD 351 U.S. 115, 124)(" Fastidious regard
for the honor of the administration of justice be made so manifest
that only irrational or peverse claims of its disregard can be
asserted") the Supreme Court, would have exercised its inherent
power to make certain that petitioner Washington's punishment was
not made possible by violation of the constitution. Article five
Section 6 of the Illinois Constitution granted the Supreme Court
of Illinois, with sufficiant power to accomplish the necessary
goal of **ensuring that constitutional violation's did not lead to
petitioner Washington's conviction and sentence where the Illinoïs
says that:" The Supreme Court, may exercise original jurisdiction
when necessary to the complete determination of any case on review
" Petitioner Washington, also argued in this petition that this
Court ends of justice requires the reversal of his bogus convict-
ion and sentence for Brady vs. Maryland violations** 272 U.S. 83,
87,83 S.Ct. 1194, 1196-97, 10 L. Ed 215, 218 (1963). to exercise
its inherent power to reverse petitioner Washington's illegal;
conviction and sentence because favorable and impeachment evidence
which was exculpatory in its nature was withheld by and known of
by prosecutors, defense attorney, and Trial Judge who acted on

behalf of the **government in this case,** " **SEE MEDICAL RECORDS OF
Mr. Washington.**

The United States Supreme Court has held that. " in criminal
prosecutions the states has an affirmative duty to disclose
evidence favorable to a defendant " (See e.g. Brady vs. Maryland
( previously Cited) " impeachment evidence as well as exculpatury
evidence falls within the Brady Rule "(See e.g. United States vs.
Bagley 105 S.Ct. 3375)(1985) and " the Brady Rule encompasses
evidence known only to police investigators and not only to
prosecutors, But the prosecutors has a duty to turn over any
evidence favorable to the defense which is known to them on the
governments behalf in the case, The First District Appellate
Court, recently held that, " A prosecutor cannot knowingly use
or allow to go uncorrected, perjuredd testimony that goes to the
substance of a witness's testimony or to facts that bear on the
witness's crediblity. This includds both exculpatory evidence and
impeachment evidence. **" WELL THIS HAS HAPPEN WITHIN PETITIONER
Washington's, case,at trial and again on Direct Appeal...**
To establish a due process violation the trial prosecutor need
not have known that the testimony was false, it is enough that
there was knowledge by prosecution". " (See e.g. People vs. Diaz
297 Ill. App. 3d 362, 372)(1998)....

## STANDARDS OF REVIEW

Section 2254 of the Anti-Terrorism and Effective Death Penalty
Act entities a prisoner such as Darryl Washington, to a writ of
Habeas Corpus, if he is being held pursuant to a state court
judgement obtained in violation of the Constitution. 28 U.S.C.
2254, Williams v. Taylor, 529 U.S. 362, 375 (2000) Lowery v.
Anderson, 225 F. 3d 833, 838 (7th Cir. 2000). With    respect
to any claim that was adjudicated on the merits in state court
proceedings, a federal court will not grant a writ of habeas
corpus unless that state decision (1) was contrary to, or involved
an unreasonable application of, clearly established federal law
as determined by the Supreme Court of the United States, or (2)
resultedd in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in
the state court proceeding. 28 U.S.C. 2254 (d) (1) & (2): Winters
v. Miller, 274 F. 3d 1161, 1163 (7th Cir. 2001), Hough v. Anderson
272 F. 3d 878, 889 (7th Cirr. 2001). Furthermore, this Honorable
District Court, will not address the merits of a habeas corpus
petition unless the petitioner Darryl Washington, can show that
he has exhausted his state remedies and avoid procedual default,
U.S. ex rel. Bell v. Pierson, 267 F. 3d 544, 551 (7th Cir. 2001).
1. Petitioner, Darryl Washington, was deniedd his constitutional
right under the Sixth and Fourteenth Amendment to a **fair and
impartial trial.**
(a) denying petitioner any opportunity to subpoena medical
records, doctors testimony from the Cook County Hospital  dated
June 20-1993, and Doctors testimony and medical records from the
Saint Elizabeth Hospital, dated August 23-1993.
(b) denying to this petitioner exculpatory evidence on discovery
wherein, said evidence would have shown that this petitioner
could not have committed the offense as charged, Such evidence
being held by prosecutors in trial court.
(2). Petitioner Darryl Washington, adppts by reference all
contentions containedd in paragraph (1) of this Petition and
states further that:
(a) Petitioner Darryl Washington, adopts by reference his Motion
FOR A New Trial, and all claims therein.
(b). Petitioner Darryl Washington, adopts by reference the
claims that the police did not have **PROBABLE CAUSE TO ARREST HIM**
within petitioner Motion To Quash Illegal Arrest, and within
petitioner Direct Appeal Brief.
(c). Petitioner Darryl Washington, adopts by reference his claim
of a illegal and very **BOGUS IDENTIFICATION MADE AFTER Ms. Ramos,
was " COERCE " BY THE PROSECUTOR TO GIVE FALSE TESTIMONY UNDER
OATH DURING TRIAL,** See R.-C-160- lines 5 and 6 So stated that she
remained back in the kitchen, and R.-C-176, lines 3,4,5,6,7, and
8, and lines 16,19,20,21,and 22. And also see R-C-177, lines
4,5,6,7,8,9,10,11,12,and 13.
And also see R.-C-177 7. Q And then you took -- you want back to

the

8. Kitchen and placed Sasha into the pantry ?
9. A. No. When Edmund and Luis Cruz couldn't
10. holdd the door anymore, when they fell on the
11. ground, we run to the kitchen to try to open the
12. door, and then I told Juan Lopez to open the door
13. While I was watching.
And R.-C-178 lines 6,7,8,9,and 10.
6. Q. Okay So Edmund and Luis are trying to keep the door closed,
7. keep the door closed, you have heard Shots ?
8. A. Yes, they were on the floor. They were
9. on the floor already. There was no time to get
10. Out fromm the back door.
And R.-C-178 lines 23 and 24.
Q. So you tried to open the back door with
24. Mr. Lopez ?
And R.-C-179 lines 1,2,and 3.
A. No. He was trying to open the back door
and I was watching so they could not come in. If
they would have come in the house.
And R. -C-179 lines 24. Q. You did that after wards ?
And R.-C-180 lines 1,2,A. After I heard the first shot, I put her
immediately in the pantry.
And lines 7,8,9, and 10 of the same page R.-C-180.
7. Q. Okay. And you also then helped your
8. mother get in the pantry, too: Correct ?
9. A. Yes. Because I didn't want to see my
10. mother right there on the floor.
And R.-C-182, lines 6,7 and 8.
6. Q. You're telling us today you saw only
7. one ?
8. A. Yes, the one that came in the house.
Then the prosecutor starting leading this witness after this
question which Mr. Washington's attorney should have objected
concerning the mark on his nose, But failed to do so.
And R-C-186 lines 5,6, and 7.
5. Q. Well, you saw one person come into the

16.

6. apartment, correct ?

7. A. Yes.

And R.-C-186 lines 8,9,and 10.
8. Q. You didn't see two or three come into the
9. apartment: Correct ?
10. A. NO.

" BUT THIS TESTIMONY IS NOT WHAT THE APPELLATE COURT JUDGES
STATED WITHIN THEIR ORDER DATED JUNE 14-1999, UNDER CASE NUMBER
ꞌ ᴿ—ꞌ ꞌ ꞌ,   1-98-0225, pages 2 and three 3.
AFTER THE TWO MEN ENTERED ELVIS APARTMENT, THERE WAS A KNOCK ON
THE DOOR. PEREZ SAW GREEN OPEN THE DOOR AND HEARD HIM SAY THAT
ELVIS WAS NOT HOME. AT THAT MOMENT THE PERSON AT THE DOOR SHOVED
IT OPEN ANDD  FIRED, HITTING GREEN ABOVE HIS LEFT EYE. " PEREZ
USHERED SEVERAL CHILDREN TO SAFETY. PEREZ THEN RAN INTO ELVIS,
ROOM WHERE SYLVIA RAMOS, WAS " HIDING " HE HEARD SEVERAL MORE GUN
SHOTS, AND WHEN HE RETURNED TO THE LIVING ROOM, THE THREE OFFENDERS
WERE GONE. PEREZ SAW GREEN LYING IN A POOL OF BLOOD. LUIS CRUZ,
HAD BEEN SHOT IN THE LEG. GREEN DIED AS A RESULT OF THE GUNSHOT
WOUND TO HIS HEAD AND HIS BACK.  "

" Now petitioner Darryl Washing, needs to know how or where did
these Appellate Court Judges, obtain this above mention testimony
from? because it do not exist no where within petitioner records
Nor did Ms. Ramos, testimony or anyone else make any statement
positive iddntification which reveal that Mr. Darryl Washington,
was even involved with this crime whatsoever ".

The fundamental unfairness of a conviction obtained by the use
of false evidence has long been recognized by the United States
Supreme Court as well as the Illinois Courts as a violation of
due process Giglio v. United States, 405 U.S. 150, 153-154, 92
.Ct. 763, 766 (1972): Napue v. Illinois, 360 U.S. 264, 269, 79
S.Ct. 1173, 1177 (1950): Pyle v. Kansas, 317 U.S. 213, 215-216,

63 S.Ct. 177, 178 (1942), Mooney v. Holohen 294 U.S. 103, 112, 55
S.Ct 340, 342 (1935). As the Court noted in Agurs, , such conduct
was not only violation constitutionally as far as mandated
disclosure obligations, but also, it involves prosecutorial
misconduct and constitutions a corruption of the truth seeking
function of the trial process. Agurs, 427 U.S. at 104, 96 S.Ct.
at 2397. For this reason, the Court has imposed a strict standard
of materialitly in cases where the prosecution uses evidence that
it knows or should have knew it was false.

Specifically, the Appellate Court Judges has made up there own
story and established a " GHOST " IDENTIFICATION AND GAVE THIS
" GHOST " CREDIBILITY TO PLACE Mr. Darryl Washington, in a
apartment shooting two individuals that he had absolutely no
problem with " EVER ".   " NOR HAVE ANY OF THESE INDIVIDUALS
STATED THAT THE PETITIONER WAS EVEN THERE WHEN THIS HAPPEN...

The Appellate Court Judges, stated that the petitioner next
argues that he was denied a fair trial where the prosecution 1)
misstated the law of accountability in closing argument,
Which this was not the only reason petitioner stated that he was
denied a fair trial, But this is the reason that the Appellate Co
Counsel, raised over petitioner many objections and true reasons
why he was denied a fair trial, " ONE OF THE MAIN REASON IS
BECAUSE THE PETITIONERE IS A POOR BLACK MAN... '" FIGHTING FOR
JUSTICE WHERE THEIR IS NONE GIVEN "  COOK COUNTY STATE OF IL, "
And it is apparent from the trial records the petitioner trial
counsel, should have raised the issue of petitioner medical
health situation at the time of this incident, and subpoenaed all
doctors and medicat records Napue v. Illinois, 360 U.S. 264, 79
S.Ct. 1173 (1959). As suck appellate counsel should have raise
this claim on direct appeal, since it was apparent from the
records, and clearly of merit Strickland, 466 U.S. 688, 109 S.Ct.
2052 (1984):

(d) Petitioner Darryl Washington, adopts by reference and
incorporate by reference the petitioner Petition For Post Convict
ion Relief, concerning all of the " Newly Discovered Evidence
and Exculpatory Evidence which was revealed to Trial Attorney but
was not used during trial nor investigated, Evidence concerning

the three individuals that was arrested on December 6-1993, in
the alley right directly behind the building where this shooting
occurred, on December 5-1993, , Because these three men were
arrested with two 25 caliber       automatic handguns, which
match 25 caliber cartridge cases found on the floor at the murder
scene on December 5-1993, **Equally important is the fact that
Robert Willhite, is the brother of Pierre Willhite, who was the
one of the three men that was arrested on December 6-1993, in
the alley, in a blue vehicle matching the description of the car
that Pierre Willhite, entered after the altercation with Elvis,
on December 5-1993, " And the guns found in this car that Mr.
Pierre Willhite, brother Robert Willhite, was arrested in one day
after this homicide occurred " " EXCUSE ME FOR NOT BEING AN
OPTIMIST, OR BELIEVING IN COINCIDENCES OF THIS MAGNITUDE "** again
See Napue V. Illinois, 360 U.S. 264, 79 S.Ct. 1173 (1959), as
well as Strickland, 466 U.S. 688, 109 S.Ct. 2052 (1984):
The " fundamental miscarriage of justice " pathway is limited to
the extraordimary case, where a constitutional violation has
probably resulted in the conviction of one who is actually
innocent " . Schlup v. Delo, 513 U.S. 298, 321, 115 S.Ct. 851
(1995).

### CONCLUSION

**WHEREFORE,** The Petitioner, Darryl Washing, prays that this
Honorable Court, will use it's Authority, and issue a Writ Of
Habeas Corpus, and vacating the Illinois Supreme Court Order,
dated March 26-2008, and remand this cause back to the trial
court, for a New Trial, with directions for the trial court, to
allow petitioner to subpoena doctors, medical records, as well
as all three individuals that was arrested on December 6-1993, in
the alley behind the building where the homicide occurred with
two 25 caliber hanguns, and all evidence concerning these guns,
as well as any other RELIEF DEEMED FAIR AND JUST IN THE SPIRIT
OF THE LAW.

                                        Respectfully submitted,

                                        Darryl Washington

A P P E N D I X

STATE OF ILLINOIS    )
                     )SS
COUNTY OF COOK       )

FILED

IN THE CIRCUIT COURT OF COOK COUNTY
CRIMINAL DIVISION

OCT - 7 1997

AURELIA PUCINSKI
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS    )
                                   )
            -vs-                   )    No. 94-CR-25737
                                   )
DARRYL WASHINGTON                  )

### MOTION FOR A NEW TRIAL

Now comes the defendant, DARRYL WASHINGTON , by his
attorney RITA A. FRY, Public Defender of Cook County, through
JAMES D. MULLENIX, Assistant Public Defender, after a finding
of guilty and before sentencing and respectfully moves this
Honorable Court to set aside the finding of guilty in the
above-entitled cause and grant him a new trial, it being
expressly understood that defense counsel has not yet been
furnished with an official transcript of the trial and makes
this motion on behalf of his client, without prejudice to or
waiving the later discovery of error in the trial record.

In support thereof, defendant states as follows:

1.    The Court erred in denying the defendants Motion to
Quash arrest.

2.    The Court erred in denying the defendant's pretrial
Motion to Sever.

3.    The Court erred in denying the defendant's Motion to
Reconsider the Motion to Sever.

4.    The Court erred in denying in part the defendant's
Motion in Limine.

5.   The Court erred in allowing State witnesses to testify as to 3 people knocking at the door of Obedina Valentine and 3 people pushing on the door.  No one saw 3 people outside the door immediatley prior to the shooting.

6.   The Court erred in allowing officer Excheverria to testify as to the defendant "fleeing" after looking at him.

7.   The  Court erred in allowing Detective March to testify as hearsay to conversations he had with Obedina Valentine.

8.   The Court erred in allowing Detective March to testify as to items handed to him by Obedina Valentine and later inventoried by the police.

9.   The Court erred in allowing Edgar Perez and other State witnesses to testify as to Darryl Washington being friends with co-defendant Pierre Wilhite.

10.   The Court erred in allowing the State to cross examine defense witness Sam Williams as to why he was wearing a uniform to court.

11.   The Court erred in allowing the State to cross examine defense witness Sam Williams as to who he works for.

12.   The State failed to prove the defendant guilty of the charges beyond all reasonable doubt.

13.   The verdict is against the weight of the evidence.

14.   The defendant was denied due process and equal protection of the laws.

15.   The State failed to prove every material allegation of each offense beyond a reasonable doubt.  This included all

counts against Luis Cruz and all counts concerning the home of Obedina Valentine, 2 witnesses the prosecution chose not to call.

16.    The Court erred in overruling the defendant's motion for a directed verdict at the close of the State's case.

17.    The Court erred in giving instructions on behalf of the State over the defendant's objection.

18.    The defendant did not receive a fair and impartial trial as guaranteed him under Article I, Paragraphs: 2, 6, 8, and 10 of the Constitution of the State of Illinois and under the Fourteenth Amendment of the Constitution of the United States.

19.    The Assistant State's Attorney made prejudicial inflammatory and erroneous statements in closing arguments designed to arouse the prejudices and passions of the jury, thereby prejudicing the defendant's right to a fair trial. Specifically the State improperly:

    (i)    argued that a majority of crimes are committed with co-defendants;

    (ii)   argued that his case is no different from any other case in this building;

    (iii)  referred to the defense of the defendants as "desperate;"

    (iv)   improperly argued that everyone who takes the stand should start with a "clean slate."

20.    The Court erred in denying the defendant's Motion of a Mistrial based upon the State's improper argument.

**WHEREFORE** for the various reasons urged before and during the trial, and every error as may appear from the official transcript of proceedings, defendant requests this Honorable Court grant him a new trial.

Respectfully submitted,

RITA A. FRY
Public Defender of Cook County

BY:    JAMES D. MULLENIX
Assistant Public Defender 30295

FIRST DIVISION
June 14, 1999

⚹ NOTICE ⚹

The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

Nos. 1-98-0225 and 1-98-0984
(Consolidated)

## IN THE
## APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No 94 CR 25737 |
| | ) | |
| DARRYL WASHINGTON and PIERRE WILLHITE, | ) | Honorable Thomas A. Hett, |
| Defendants-Appellants. | ) | Judge Presiding. |

### O R D E R

Following a jury trial, defendant Darryl Washington and codefendant Pierre Willhite were convicted of first degree murder, home invasion, and aggravated battery with a firearm, and each was sentenced to 66 years' imprisonment. On appeal, defendant contends that the police lacked probable cause for his arrest, and that he was denied a fair trial because of the prosecutor's highly inflammatory closing argument. Codefendant argues that the trial court failed to conduct a proper Montgomery balancing test before allowing the State to impeach him with his two prior felony convictions, and that the State improperly bolstered its single eyewitness when a detective gave hearsay testimony that a second eyewitness had identified codefendant.

1-98-0225 and 1-98-0984 (Cons.)


On December 5, 1993, about 6:30 p.m., codefendant was at
2051 West Division Street where he saw Dalila Robles, and asked
whether her boyfriend Elvis Valentin was home. Dalila ran to the
third-floor where Elvis lived and yelled there was a "Prieto"
looking for him. "Prieto" is a Spanish slang term for black man.
Codefendant interpreted the term as a derogatory remark, and when
Dalila returned the two argued. Elvis heard the argument and
came downstairs. Elvis and codefendant then argued, and Elvis
punched codefendant in the face. Codefendant left saying, "I'll
be back."

At this same time Edmond Green and Edgar Perez were on the
second-floor and heard the argument. Perez witnessed the fight
and saw codefendant leave. Perez and Green then left that
apartment and went to a friend's house. While they were there,
they received a telephone call from Elvis asking them to come
back. As they walked back to 2051 West Division, Perez saw three
black men get out of a car and enter the building. As Green and
Perez walked up the stairs, the three men came down the stairs,
making eye contact but not talking. As they entered Elvis'
apartment, Green told Perez that one of the men was named
"Gooch."

After the two men entered Elvis' apartment, there was a
knock on the door. Perez saw Green open the door and heard him
say that Elvis was not home. At that moment the person at the

- 2 -

1-98-0225 and 1-98-0984 (Cons.)

door shoved it open and fired, hitting Green above his left eye.
Perez ushered several children to safety.  Perez then ran into
Elvis' room where Sylvia Ramos was hiding, he heard several more
gunshots, and when he returned to the living room, the three
offenders were gone.  Perez saw Green lying in a pool of blood.
Luis Cruz had been shot in the leg.  Green died as a result of
the gunshot wound to his head and his back.

Detective David March testified that he was assigned to the
investigation of the homicide of Edmond Green, and on December 5,
1993, he interviewed witnesses and was given a description of
three men involved in this crime.  Also, Elvis Valentin
identified one offender as someone named "Pierre."  Detective
March learned that Edgar Perez had seen the shooting and looked
for him, but did not interview him until December 10, 1993.
March stated that during this interview Perez did not claim to
have seen the person who shot Green, but he fled into a bedroom
when the shooting began.  However, Perez testified that when
interviewed, he told March that he recognized the shooter from
the neighborhood.

Detective March also interviewed Luis Cruz on or about
December 10, 1993, after he was released from the hospital.  Cruz
said that shortly before the shooting, Edmond Green told him that
one of the men was nicknamed "Gooch."  He also said that after
his release from the hospital, he talked to people and learned

- 3 -

1-98-0225 and 1-98-0984 (Cons.)

that the other two assailants' nicknames were "Scooter" and
"Pierre," and all frequented Wicker Park.  Detective March went
there and spoke to a park employee, who said that the three
individuals were Vice Lords and gave the police a description of
Gooch and Scooter.  The police followed up on the information and
found that "Pierre" was codefendant Pierre Willhite.
Specifically, March gave the following testimony under direct
examination by the prosecutor:

> "Mr. Nolan [Assistant State's Attorney]:
> After you interviewed Edgar Perez and Luis
> Cruz that evening, what did you do.  Did you
> look for anybody else that evening?
>
> A. Yes. One of the subjects, one of the
> offenders in the incident had been
> identified and we attempted to locate
> him at the addresses that we had known
> him to use.
>
> Q. Who specifically did you try to
> locate that evening?
>
> A. Pierre Willhite."

Detective March further said that on December 18, 1993, he
asked the police in the area of Wicker Park for any files on a
person called "Scooter," and was told that "Scooter" was
defendant Washington.  Defendant's picture was then shown to

- 4 -

1-98-0225 and 1-98-0984 (Cons.)

Sylvia Ramos that same day, and she tentatively identified defendant.  On January 12, 1994, Edgar Perez positively identified codefendant from a photo array but could not identify defendant except to say that he was codefendant's friend.  A "stop order" was then issued for defendant.

On January 20, 1994, about 8:21 p.m. Chicago police officer Caesar Echeverria and Officer Motzny arrested defendant after learning over dispatch that a man wanted for a homicide was at the Wicker Park field house wearing a purple jacket with the cartoon character Tweetie Bird on it.  The officers were in full uniform, and when they entered the field house they saw defendant who was wearing that style jacket.  Defendant was using the telephone, and when he looked in the officers' direction he dropped the telephone and ran.  Defendant was apprehended about 100 feet away.  At the police station, Sylvia Ramos identified him as one of three people who came to the apartment that day and began shooting.  On September 23, 1994, codefendant was arrested, and Sylvia again identified defendant from a lineup as did Elvis and Delila.  Elvis, Delila and Sylvia identified codefendant as being involved in the altercation that happened earlier on the evening of the shooting, and Edgar Perez identified codefendant as being involved in the shooting.

Prior to trial, defendant made a motion to quash his arrest and suppress his out-of-court identification.  After hearing

1-98-0225 and 1-98-0984 (Cons.)

testimony from Officer Echeverria and Detective March, the court
found that at the time of the arrests the police knew that the
offenders were identified as Gooch, Scooter, and Pierre. The
police then went to the police station in the district where the
offenders were known to frequent and obtained pictures of Gooch,
Scooter and Pierre, and showed them along with a photo array to
the witnesses to the shooting. Codefendant was positively
identified and defendant was tentatively identified. Then, the
police received a flash message that one of the persons involved
was at the field house. When defendant saw the police, he ran.
The court found that based on the totality of the evidence the
police had probable cause to arrest defendant.

Glen Christmas, a physical instructor at the Wicker Park
field house, testified for defendants that he was familiar with
defendants. Both played basketball at the park, but he never saw
defendant and codefendant together. In 1993, defendant was
injured in an accident and did not play much basketball
thereafter.

Samuel Williams, a security guard, testified that he often
went to the park to play basketball. He never saw defendant and
codefendant together. After defendant was injured, he would
still come to the park but not play basketball. Williams stated
that on December 5, 1993, defendant was at the park most of the
day. Williams left the park about 7:30 p.m., and went to see

1-98-0225 and 1-98-0984 (Cons.)

Elvis Valentin, who lived about five blocks away.  As he
approached the apartment door, he heard shots and ran down the
stairs.  While running, he saw shadows moving down the back
stairs.

Danny Willhite testified that on December 3, 1993, he
brought his brother, the codefendant, home with him to 11801
South Lowe in Chicago where codefendant stayed for two weeks.
The next day codefendant was in the house all day for the
birthday of Danny's wife.  Danny said that he and codefendant
stayed at the house most of the day of the shooting, except for
when they left together several times in the morning or afternoon
to run some errands.  Danny left codefendant at the house about 7
p.m. on that date when he went to get his children from a
babysitter.  Danny said that when he left the house, codefendant
was still there.  Danny's wife corroborated this testimony.

Cheryl Williams, codefendant's sister testified that
codefendant moved out of her house in Des Plaines, Illinois, on
December 3, and moved in with Danny and his wife.  Scott
Williams, codefendant's manager at the restaurant where he had
worked in Des Plaines, testified that codefendant did not show up
for work after December 3.

Codefendant testified on his own behalf.  Before he did so,
the trial court considered a prosecution motion concerning
whether codefendant should be allowed to say that he pled guilty

- 7 -

1-98-0225 and 1-98-0984 (Cons.)

to his two prior convictions, which were going to be introduced
as impeachment. The court found that codefendant should be
permitted to show that his prior convictions were by a plea of
guilty. The court cited some case law and then said:

> "All those cases, the answer to that is the
> same thing, you can impeach him with the
> robbery, I have under Montgomery and Williams
> analysis believe that I have made the
> balancing test, this is not the same, not the
> same crime as the other -- as the crimes that
> he was convicted of and therefore the State
> can impeach by telling the jury what the
> crime was on the date of convictions."

Codefendant then testified that he first saw Elvis Valentin
in October 1993 when codefendant was on Hoyne and Pierce Streets
with his Puerto Rican girlfriend, Sandra Torentino. Elvis and
several other Latino men were trying to talk to Sandra. At one
point, Elvis pulled out a gun, and codefendant and Sandra ran to
codefendant's house. Later that month, codefendant moved to his
sister's house in Des Plaines.

Codefendant was still living in Des Plaines, but on December
3, 1993, he came to Chicago to his mother's house at 1219 North
Leavitt. He then went to his brother's house to make
preparations for his sister-in-law's birthday. He stayed there

1-98-0225 and 1-98-0984 (Cons.)

the next two days and never went to 2051 West Division, never
argued with Elvis Valentin and never shot Luis Cruz or Edmond
Green.

Codefendant testified that in September 1988, he pled guilty
to robbery, and in March 1989 he pled guilty to another robbery.

During the State's rebuttal argument, the State commented on
codefendant's credibility. The prosecutor told the jury to
disbelieve codefendant because he was a "two-time convicted
felon." In the course of making that argument the prosecutor
said several times that codefendant "did not start with a clean
slate." Several defense objections were overruled, however,
later the court reconsidered and told the jury that the
prosecutor's "clean slate" argument was inappropriate and
incorrect, and that the jury should only use codefendant's prior
convictions as impeachment.

Additionally, during closing argument the prosecutors told
the jurors that the prosecution did not have to prove who had
shot the victims, because the law of accountability was that
criminals are basically cowards, and "why do something yourself
*** when you can take your buddies along and do more damage and
get the job done easier." The jury was also told that defendant
and codefendant were "thick as thieves," that they acted in
concert, and that defendant and codefendant put on a defense

- 9 -

1-98-0225 and 1-98-0984 (Cons.)

because they were desperate.  Lastly, the prosecutor attacked the
character of a defense witness.

Defendant Washington first argues that the police officers
did not have probable cause for his arrest.  Whether probable
cause exists is a commonsense, practical question to be
determined upon examination of the totality of the circumstances
presented.  People v. Robinson, 167 Ill. 2d 397, 405 (1995).  To
determine whether a warrantless arrest is based on sufficient
probable cause, the trial court must decide whether a reasonable
and prudent person, having knowledge possessed by the officers at
the time of the arrest would believe the defendant committed an
offense.  People v. Lippert, 89 Ill. 2d 171, 178 (1982).  The
police need not possess evidence sufficient to convict, but need
only have knowledge of facts which would lead a reasonable person
to believe that a crime has been committed by the defendant.
People v. Neal, 111 Ill. 2d 180, 193 (1985).  Furthermore, when
police officers are working together to investigate a crime or
possible crime, probable cause may be  established from their
collective knowledge even if it was not within the personal
knowledge of the arresting officer.  People v. Hendricks, 253
Ill. App. 3d 78, 89 (1993).

At the time of the arrest, the police knew that a shooting
had occurred, and that about an hour earlier there had been an
altercation between Elvis Valentin and codefendant.  The police

1-98-0225 and 1-98-0984 (Cons.)

were told that three individuals, "Gooch, "Scooter" and "Pierre" were the shooters, and they frequented the Wicker Park field house. The police identified Pierre as codefendant, went to Wicker Park, were given a description of the suspects, and were told that they often came to the field house.

Detectives then contacted the local police district and asked for a name search in the nickname file for "Scooter." They received defendant's name. The police then obtained defendant's picture and showed it to one of the witnesses who identified defendant as one of the shooters. Based on that information, the detectives submitted a "stop order" for defendant. Next, detectives showed defendant's picture to another witness, who identified codefendant as the shooter and defendant as one of his friends. A few days later, Officer Echeverria was on routine patrol in the Wicker Park area when he received a message which indicated that an anonymous caller had notified police that a murder suspect was in the Wicker Park field house, and was wearing a purple jacket with a cartoon character on it. As the officers entered the field house, they saw defendant wearing this type of jacket. When defendant saw the officers, he ran.

To support his argument defendant contends that the anonymous tip was insufficient, and the identification by the witness was insufficient for the arrest. However, all of the events taken together determine probable cause. The arrest in

- 11 -

1-98-0225 and 1-98-0984 (Cons.)

this case was not based solely on information provided by an informant; thus defendant's cases regarding this are inapposite. Compare People v. Exline, 98 Ill. 2d 150 (1993); People v. Johnson, 94 Ill. 2d 148 (1983). The informant here merely provided the police with information of where defendant was, information that was verified once the police went to the location. We find that the information collectively known by the police in this case was sufficient to establish probable cause for defendant's arrest.

Defendant next argues that he was denied a fair trial where the prosecution 1) misstated the law of accountability in closing argument; 2) argued that the law required the jury to return a verdict of first degree murder; 3) argued that codefendant "did not start with a clean slate;" 4) misstated the evidence; 5) told the jury that he and codefendant put on a defense because they were desperate; and 6) attacked the character of a defense witness.

When reviewing challenges to statements made during closing arguments, the court must examine the statements in their entirety and scrutinize them in their proper context. People v. Pasch, 152 Ill. 2d 133, 207 (1992). A prosecutor is allowed wide latitude in closing argument, and the propriety of his remarks is within the trial court's discretion. The prosecution may base its closing argument on the evidence presented or reasonable

- 12 -

1-98-0225 and 1-98-0984 (Cons.)

inferences therefrom, respond to comments by defense counsel
which clearly invited or provoke response, denounce the
activities of defendant and urge that justice be administered,
and highlight inconsistencies in the defendant's argument.
People v. Morrison, 137 Ill. App. 3d 171, 184 (1985).

Defendant first argues that the prosecutor misstated the law
of accountability when he stated that the State did not have to
prove who had shot the victims because the law of accountability
in Illinois was that criminals are "basically cowards." The
reference to cowards was an isolated comment and the law of
accountability was explained to the jury by the prosecutor, and
by the instructions. Merely because the prosecutor argued that
defendant and codefendant were cowards because they needed their
"buddies along to help them" does not establish that he misstated
the law. Also, the fact that the prosecutor asked the jury to
find defendant and codefendant guilty was not a statement that
they were required by law to find them guilty. In this case, the
jury was properly instructed on the law of accountability and the
prosecutor did not misstate the applicable law.

Defendant next argues that the prosecutor committed error
when he said that codefendant did not "start with a clean slate,"
when discussing whether codefendant was believable. Defendant
argues that "Evidence of other crimes is not admissible to show
propensity to commit a crime or credibility." While a

- 13 -

1-98-0225 and 1-98-0984 (Cons.)

defendant's prior felony conviction cannot be used to show that
he had a propensity to commit the crime, it can be used for other
reasons.  People v. Robinson, 167 Ill. 2d 53, 62-63 (1995).
Felony convictions such as robbery are probative of a person's
credibility and are admissible within the sound discretion of the
trial court.  People v. Barnes, 117 Ill. App. 3d 965, 978 (1983).
Furthermore, the jury was specifically instructed that the prior
convictions were only to go towards codefendant's credibility and
should not be considered as evidence of guilt.  There was no
error in this case.

Next, defendant claims that the prosecutor committed
reversible error by arguing that on the night of the shooting,
the defendant and codefendant were "thick as thieves," "just as
they sit together today *** they acted in concert," because there
was no witness who put both codefendant and defendant together at
the scene of the shooting.  However, one of the witnesses saw
codefendant there, and another confirmed defendant's presence.
The fact that each witness could not identify all three
assailants does not mean defendant and codefendant were not there
together.  The prosecutor's argument was a permissible inference
from the evidence.

Defendant next complains that the jury was told defendant
and codefendant "put on a defense because they were desperate,"
and this infringed on defendant's absolute right to present a

- 14 -

1-98-0225 and 1-98-0984 (Cons.)

defense.  Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297 (1973).  The comment was made during rebuttal:

> "Let's talk about some of the defense
> witnesses.  You know, the defendants don't
> have to put on a case.  They can just sit
> back here and say to the effect, show me the
> money, just sit back here, put on no
> witnesses whatsoever.  But they did put on
> witnesses in this case.  And since they put
> on a defense you can take that defense now
> and use it to assist you in arriving at your
> verdict.  They put on a defense because they
> were desperate."

It is clear that the comment, when taken in context, was not to tell the jury that defendant was guilty because he chose to put on a defense.  The prosecutor was merely stating that the defense which defendant chose to present to the jury was unbelievable.

Lastly, defendant alleges that the prosecutor erred in discussing the attire of Sam Williams, a defense witness.  The prosecutor stated:

> "Darryl Washington called Sam, the man with
> the badge, Williams.  Sam Williams testified,
> Sam Williams is a liar, an out and out liar.

- 15 -

1-98-0225 and 1-98-0984 (Cons.)

> Sam Williams, the man who had to zip up his
> coat so he won't show his badge out in the
> hallway unzipped his coat and paraded in
> front of you with a badge sticking out. He's
> the same man who the day before as he
> admitted on the stand was sitting in the
> first row wearing his security guard badge.
> Don't believe the stuff that he just wanted
> to get by the security check points at the
> front. He had the badge around his neck the
> day before, he had the badge around his neck
> on Friday when he testified in full uniform.
> He didn't have the badge on his uniform; he
> had the badge around his neck."

While this argument regarding William's clothing was
erroneous, we believe any improper argument was harmless, given
overwhelming evidence of guilt. We therefore affirm defendant's
conviction.

Codefendant contends that the trial court failed to conduct
a proper Montgomery balancing test before permitting the State to
impeach him with his two prior felony convictions. Codefendant
contends that the court's comments indicate that it only
considered whether the offenses were identical to the ones
charged. Codefendant's argument is misplaced.

1-98-0225 and 1-98-0984 (Cons.)


As provided in Montgomery, a witness can be impeached with a
prior criminal conviction, not more than 10 years old, if the
conviction is punishable by death or imprisonment in excess of
one year or if it involves dishonesty or false statement
regardless of punishment. Admissibility of convictions that meet
either of these tests is discretionary with the trial court, such
that if the judge determines that the probative value of the
evidence of the crime is substantially outweighed by the danger
of unfair prejudice, evidence of the conviction will not be
admitted. People v. Williams, 173 Ill. 2d 48, 81 (1996). There
is no error if the trial court does not expressly articulate this
balancing test as long as the trial transcript makes clear that
the trial judge was applying the Montgomery balancing test.
Williams, 173 Ill. 2d at 83. If the record shows that the trial
court did not conduct a meaningful Montgomery test, error is
committed. People v. McGee, 286 Ill. App. 3d 786, 793 (1997).

However, codefendant here did not object to the admission of
his prior convictions at trial and did not raise the issue in his
post-trial motion. The only issue raised in this case was
whether codefendant should be allowed to introduce the fact that
the convictions were by a plea of guilty. Had codefendant raised
the issue, the court would have been in a position to consider
the arguments made, and make a ruling based on the Montgomery
criteria. We find that the issue is waived. People v. Senor,

1-98-0225 and 1-98-0984 (Cons.)

118 Ill. App. 3d 694, 696 (1983).  We also find no plain error on
the record before us.  The evidence was not closely balanced, and
any error did not affect codefendant's rights.  See People v.
Georgakapoulos, No. 1-97-2537, slip op at 14, filed March 16,
1999.

In any event, we do not find any error.  As stated above,
the court need not expressly articulate the balancing test as
long as the trial transcript makes clear that the trial judge was
applying the Montgomery balancing test.  Williams, 173 Ill. 2d at
83.  Even though codefendant did not object to the use of the
prior convictions, the court specifically stated that it had made
the balancing test under Montgomery and Williams, and found the
convictions admissible.  The court was aware of Montgomery, and
it appears from the record the court gave appropriate and
explicit consideration to that test.  See People v. Redd, 135
Ill. 2d 252, 325-26 (1990).

Next, codefendant argues that the State improperly bolstered
its single eyewitness case when Detective March gave hearsay
testimony that a second eyewitness identified codefendant as one
of the offenders, even though only Edgar Perez identified
codefendant at trial as one of the offenders.

First, the issue is waived by the failure of codefendant to
object or raise the issue in his post-trial motion.  People v.
Enoch, 122 Ill. 2d 176, 186 (1988).  In any event, the hearsay

- 18 -

1-98-0225 and 1-98-0984 (Cons.)

rule generally prohibits out-of-court statements when they are considered for the truth of the matters asserted. People v. Jackson, 293 Ill. App. 3d 1009 (1997). However, a police officer may testify about conversations to describe his investigative procedures, but the officer should not reveal the substance of a witness' hearsay statements. People v. Trotter, 254 Ill. App. 3d 514, 527-28 (1993).

In this case, Detective March merely stated that he interviewed Edgar Perez on December 10, 1993, and then interviewed Luis Cruz. He then testified that after interviewing both men the police began looking for codefendant because he had been identified as one of the offenders. Detective March never testified that Luis Cruz identified codefendant, and never revealed the contents of his conversation with Cruz. March merely testified as to the steps taken in the investigation. His testimony was therefore admissible.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed. As part of our order we assess $100 against each defendant as costs for the State's defending this appeal.

Judgments affirmed.

GALLAGHER, J., with O'BRIEN, P.J., and O'MARA FROSSARD, J., concurring.

IN THE

CIRCUIT COURT OF COOK COUNTY

People of the State of Illinois )
           Plaintiff, )
                )
                )
     vs            )    Case No. 94-▒▒▒▒
                )
Darryl Washington       )
         Defendant, )
                )
                )

## MOTION TO PROCEED IN FORMA PAUPERIS
## AND APPOINTMENT OF COUNSEL

    Petitioner, Darryl Washington, now comes before the Court and respectfully request that he be permitted to file the attached Petition For Post-Conviction Relief in forma pauperis and to have an attorney appointed to represent him in this proceeding.

    In support thereof states as follows:

  1. He is presently incarcerated at Pontiac Correctional Center, located at 700 West Lincoln Street, Livingston County, Pontiac, Illinois 61764

  2. He is without any income or assets with which to pay for the cost of this litigation or to procure Counsel

    Wherefore, Petitioner prays that he be granted leave to file and proceed in forma pauperis in the above-captioned Petition For Post-Conviction Relief and have Counsel appointed to represent him in this proceeding.

                                       _Darryl Washington_
                                       Darryl Washington

IN THE

CIRCUIT COURT OF COOK COUNTY

People of the State of Illinois )
    Plaintiff, )
                  )
vs )       Case No. 94- CR-9737
                  )
Darryl Washington )
    Petitioner, )

## NOTICE OF FILING

Please be advised that on  6 - 5 -  , 2000, I have mailed
the original and two (2) copies of petitioner's Post-Conviction
Petition to the Clerk of the above Court for filing.

                               TO: Richard A. Devine
                                   State's Attorney-101
                                   2650 S. California Ave.
                                   Chicago, Illinois 60608

I, Darryl Washington, do hereby declare under the penalty of
perjury that I have served the above named with a copy of the afore-
mentioned Post-Conviction Petition, via the U.S. Mail by depositing
same in a envelope bearing the above indicated address attaching
the proper postage and tendering the same to Pontiac Correctional
Center authorities for mailing.

                                   *Darryl Washington*
                                   Darryl Washington

Subscribed and Sworn to before me
on this 5th day of June ,2000

*Kathryn J. Donovan*
NOTARY PUBLIC

"OFFICIAL SEAL"
KATHRYN J. DONOVAN
Notary Public, State of Illinois
My Commission Exp. 09/30/2002

IN THE

CIRCUIT COURT OF COOK COUNTY

People of the State of Illinois )
            Plaintiff, )
)
       vs )
)     Case No. 94-CR-9737
Darryl Washington )
           Defendant, )
)
)
)

## MOTION TO PROCEED IN FORMA PAUPERIS
### AND APPOINTMENT OF COUNSEL

     Petitioner, Darryl Washington, now comes before the Court and respectfully request that he be permitted to file the attached Petition For Post-Conviction Relief in forma pauperis and to have an attorney appointed to represent him in this proceeding.

     In support thereof states as follows:

     1. He is presently incarcerated at Pontiac Correctional Center, located at 700 West Lincoln Street, Livingston County, Pontiac, Illinois 61764.

     2. He is without any income or assets with which to pay for the cost of this litigation or to procure Counsel

     Wherefore, Petitioner prays that he be granted leave to file and proceed in forma pauperis in the above-captioned Petition For Post-Conviction Relief and have Counsel appointed to represent him in this proceeding.

                                     Darryl Washington

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Respondent, | ) | Post Conviction No. _____ |
| | ) | |
| vs. | ) | Case No. 94-CR-25737 |
| | ) | |
| DARRYL WASHINGTON, | ) | The Honorable |
| | ) | Thomas Hett |
| Petitioner. | ) | Judge Presiding |

## VERIFIED PETITION FOR POST - CONVICTION RELIEF

NOW COMES DARRYL WASHINGTON, the above named petitioner, and pursuant to
725 ILCS 5/122-1 et seq. (West 1998) moves this honorable court to vacate the
judgement and sentence entered in the above-entitled cause January 9, 1998. In
support of his petition, petitioner states the following:

### PROCEDURAL HISTORY

Darryl Washington was charged by indictment no. 94-CR-25737 with the
offense of first degree murder. After a jury trial before the Honorable Thomas
Hett, Mr. Washington was convicted and on January 9, 1998, sentenced to sixty
(66) years imprisonment in the Illinois Department of Corrections. At all times
relevent, Mr. Washington was represented by Assistant Cook County Public Defen-
der James D. Mullenix. The Illinois Appellate Court, First District affirmed
both conviction and sentence June 14, 1999, in an unpublished, consolidated
order (No. 1-98-0225 and 1-98-0984, People v. Washington and Willhite). And on
April 5, 2000, the Illinois Supreme Court denied petitioner Leave to Appeal. A
petition for a writ of certiorari to the United States Supreme Court is currently
pending.

## STATEMENT OF THE CASE

On December 5, 1993, Mr. Edmund Green was shot to death in the third floor apartment at 2051 W. Division Street in Chicago, Illinois. A second man, Mr. Louis Cruz, also suffered a gunshot injury at the same time but survived.

Chicago Police Detective March went to the apartment that date to interview the witnesses and begin a murder investigation. Detective March was told that three male blacks were involved in the shooting. No names of the offenders were given and the description of one was approximately 6 feet tall; another 5 foot 6 inches. No description of the third alleged shooter was obtained.

Some days later and after being released from the hospital Louis Cruz told detective March that he heard "from the neighborhood" that "Scooter", "Gooch" and "Pierre" were the shooters and that they hung out in the Wicker Park are of Chicago. In follow up, Detective March called the Wicker Park area police who checked their "nickname file" wherefrom it was gleaned that there was a "Scooter" whose name was Darryl Washington. Mr. Washington had a criminal history photograph on file which was subsequently used in a five photograph photo array and shown to Sylvia Ramos, one of the witnesses/victims whom had also been inside the apartment when the shooting occurred.

Viewing the photo array some two weeks after the shooting took place, Ms. Ramos did not positively identify Mr. Washington as one of the shooters but told Detective March the picture of him looked like one of the offenders but she would need to see him in person to be sure.

Also viewing this same photo array was Edgar Perez, a witness whom had seen the shooters on their way up the stairs moments before the shooting. Perez did not identify Mr. Washington as one of the trio but did state that he was

known to Mr. Perez to be an "associate" of Pierre Willhite, whom Mr. Perez subsequently identified as one of the shooters.

Ms. Obedine Valentine, the homeowner and eye-witness to the shooting was also shown the photo array but did not identify Mr. Washington as one of the shooters.

Police then secured an arrest warrant for Pierre Willhite. No warrant was obtained nor sought against Darryl Washington. Detective March, however, did request and secure what he described was a departmental "stop order". This was a "flag" placed on Mr. Washington's history and name which would require any police officer who came in contact with Mr. Washington to detain him for purposes of Detective March' investigation.

VI    On January 20, 1994, Chicago Police officers Echevarria and Motzny were on routine patrol at approximately 8:20 p.m. when a general broadcast on police radio stated that an anonymous informant had called 911 claiming that someone who was wanted for murder could be found at the Wicker Park Fieldhouse, wearing a purple jacket with the cartoon character "Tweetie Bird" on it.

Officers Echevarria and Motzny, who were in the area, proceeded to the fieldhouse to investigate. Knowing nothing of whether or not the party whom fit the description was in fact wanted for murder, the officers saw Darryl Washington wearing the above-described jacket and talking on a payphone. Upon seeing the officers approach him, Mr. Washington dropped the phone and fled approximately 100 feet before apprehended by the officers and placed under arrest. Officer Echevarria admitted that at the time he arrested Mr. Washington he was not violating any laws.

Prior to trial, Mr. Washington moved to quash the arrest and the results of a line-up he was placed in immediately thereupon based on the ground that said arrest was made without requisite probable cause and that the "stop-order"

obtained by Detective March and used by Officer Echevarria as the sole basis
for Mr. Washington's post-arrest detainment could not be used to circumvent
the constitutional protections of the Fourth Amendment. This motion was denied.

At trial it was revealed that approximately one hour before the shooting
Pierre Willhite, the co-defendant in this case, and Elvis Valentine, (the son
of Obedina Valentine) had an altercation inside the building on the stairs. The
altercation resulted in Elvis Valentine striking Pierre in the face. Neither
Valentine nor anyone else ever testified or told police that Mr. Washington
was with Pierre Willhite when this occurred.

Sylvia Ramos also testified at the joint trial of Darryl Washington and
Pierre Willhite. Ms. Ramos affirmed that when she viewed the photos at the req-
uest of Detective March she was unsure that Mr. Washington had been one of the
offenders. She further testified that only one person entered the apartment and
began shooting. When asked to describe this person, Ms. Ramos could only state
"[w]ell, I knew he was dark, black." And when asked to make an in-court ident-
ification of the person whom she saw enter the apartment and shoot, Ms. Ramos
twice identified Pierre Willhite as the shooter in open court until the state's
attorney insisted Ms. Ramos not only be given a third opportunity to identify
Mr. Washington but be allowed to leave the witness stand to do so.

Under cross-examination, Ms. Ramos admitted prior to testifying that day
the state's attorney had shown  her the photo of Mr. Washington and told her
his name and that they were going to show her the same photo when she testified
and also told her where Mr. Washington would be sitting while in the courtroom.

Edgar Perez also testified at trial that only one person entered the apart-
ment and began shooting. Mr. Perez, however, identified Pierre Willhite as the
shooter and reaffirmed his prior statements to police that Mr. Washington was
not one of the men seen by Perez on the stairs moments before the shooting.

Mr. Sam Williams, an off duty security guard who knew Mr. Washington and was in the vicinity of the shooting when it took place testified on the behalf of Mr. Washington. Mr. Williams testified that he had saw men fleeing and Mr. Washington was not one of them.

During closing arguement the prosecutors, over numerous objection by Mr. Washington's defense counsel, told the jurors the state did not have to prove who shot the victims because the law of accountability in Illinois fully recognized that criminals are basically cowards. The jury was also told that Pierre Willhite and Darryl Washington, on the night of the shooting, were "thick as thieves" and that "just as they sit together today....they acted in concert".

Later, the jury was told by the prosecution not only that the defendants "put on a defense because they were desperate" but that Sam Williams, Mr. Washington's defense witness was an "out and out liar" because not only was his testimony suspect but the jury was to consider how Mr. Williams dressed when he was in the public gallery and at the time he testified.

Mr. Washington was subsequently found guilty of first degree murder and sentenced to 60 years in the Illinois Department of Corrections.

On direct appeal petitioner argued police lacked probable cause to effectuate the warrantless arrest of petitioner; that flight itself was insufficient to base arrest; and, the prosecutor's closing arguements deprived petitioner of a fiar trial. (See, Appendix A)

On June 14, 1999, The Illinois Appellate Court, First Judicial District, in a consolidated order, affirmed petitioner's conviction and sentence. (See, Appendix B) Petitioner then moved for leave to appeal to the Illinois Supreme Court, (see, Appendix C) and this request was denied April 5, 2000. (See, Appendix D). This petition follows.

CLAIM I

DARRYL WASHINGTON WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHERE
APPOINTED COUNSEL FAILED TO INVESTIGATE OR DEVELOP EVIDENCE AND
INFORMATION WHICH COUNSEL KNEW OR REASONABLY SHOULD HAVE KNOWN WAS
EXCULPATORY IN NATURE AND SIGNIFICANTLY BOLSTERED THE TESTIMONY OF
SAMUEL WILLIAMS, AN EYE-WITNESS CALLED ON BEHALF OF DARRYL WASHINGTON.

Due to the indigency of Darryl Washington, the Cook County Public Def-
ender was appointed to represent him . Taking on the case was Assistant Public
Defender James Mullenix.

Prior to trial, Mr. Mullenix filed motion to quash arrest, severence,
and exchanged motions for discovery with the prosecution. Pursuant to Supreme
Court Rule 415 the state tendered to Mr. Mullenix several investigative and
police reports as well as summarized occurence and eye-witness statements and
a list of prospective witnsees the state intended to call at trial. Conversely,
Mr. Mullenix provided the state with like information and a list of witnesses
he intended to call on behalf of Mr. Washington.

At trial, there was little ambiguity as to Mr. Washington's defense: He
was not present at the time of the offense.

Establishing through cross-examination of Sylvia Ramos and Edgar Perez
(the state's "eye-witnesses") that only one party of the three offenders alleg-
edly involved in the shooting actually entered the apartment and began shooting,
(R. C. 186; D. 20-21) Mr. Washington argued to the jury that the prior descrip-
tion statements Ms. Ramos gave police; her twice misidentification of Washington
in open court; along with the testimony of Mr. Perez that co-defendant Willhite
was in fact the shooter (R. D. 20-23) clearly demonstrated Ms. Ramos was mist-
aken  in her claim Mr. Washington was the individual whom entered the residence
December 5, 1993 and began shooting.

In further support of his arguement, Mr. Washington call Samuel Williams. Mr. Williams testified that on December 5, 1993, he was approaching the build- ing wherein the incident occurred when he heard shots ring out. R. E. 51) He then began to run up the front stairs inside the building leading  to the area of the apartment. R. E 52) Mr. Williams then noticed "shadows" running "down the back stairs" (R. E 52) Williams testified that because he had just left Mr. Washington at Wicker Park, approximately 5 blocks away, he knew that neither of the "shadows" running down the back stairs was that of Mr. Washington. (R. E 52- 53)

In its closing (or rebuttal) the state, after pointed remarks and repeated attacks on the selected dress of Mr. Williams throughout the course of the trial (both while in the public gallery and on the witness stand), (R. F 129) staunchly maintained no evidence existed supporting Mr. William's testimony and that for Mr. Willimas to say "that he saw in the shadows a couple people going out the back stairs and they were'nt this guy, Darryl Washington, is an out and out lie because that means the shooters would have had to have gone out the back door which means the would have come in the  back door, done the shooting, right by the front door and then go all the way back out and exit out the back door".... (R. F 131) (emphasis added).

It is with this prosecutorial theory before the court that forms the basis of Mr. Washington's claim that the information his appointed counsel failed to develop and/or investigate was exculpatory in nature. In support of his claim, Mr. Washington submits Exhibit A, a copy of an investigative report dated Decem- ber 6, 1993.

This report was tendered to counsel by the state and its content revealed that three youths, whose descriptions closely matched that of the offenders given shortly after the incident (see Exhibit B at 2), had been arrested in the early a.m. of December 6, 1993, in the alley behind the building wherein the shooting occurred. More importantly, these men were found to be in possession of two .25 caliber semi-automatic handguns (Exhibit A at 4) one of which, an "Excam", blue steel, pistol matched the exact description of one of the weapons used in in shooting. (See, Exhibit A at 7). And, the .25 caliber cartridge cases found on the floor at the scene (Exhibit A at 3) is also a coincidence which cannot be ignored.

In addition to the above, police summarized for defense counsel the statements given by the youths in relation to their coming into possession of these particular weapons. Initially, Nayati Johnson and Robert Willhite (the brother of Pierre Willhite coincidently) told police they had found the weapons on the ground in the alley behind the building where he lived, 2049 W. Division. (This was right next-door to the building the shooting occurred in). After further questioning, Nayati Johnson admitted this was not true. He then told police that when he "pulled into the alley three black male subjects ran up to the car and handed him the weapons." (Exhibit A at 10) The "three men" were not known to Nayati but were friends of his cousin, Zuriel, who was also in the car. (See, Exhibt A at 10).

The above information went completely ignored by Mr. Washington's counsel. Also relevent is the car the youths were driving at the time they were stopped. At the time of the stop, Nayati Johnson was driving a 1985 Buick station wagon. (Exhibt A at 10) The vehicle was blue in color and closely matched the vehicle described by a witness whom was standing outside 2051 W. Division and revealed to be the vehicle Pierre Willhite entered after his altercation with Elvis

Valentin, (See Exhibit C; R. D, 11-12).

The above discussed information was vital to Darryl Washington's defense in that its cumulative effect clearly would have created reasonable doubt as to his guilt. Had the information been investigated and developed, the identity of the "three black male subjects" whom Nayati Johnson claimed ran up to the car and handed in the weapons could have been ascertained (assuming this claim was true); ballistics tests could have been performed; and, standing alone, the information would have significantly bolstered the testimony of defense witness Samuel Williams who testified the shadows he saw ran down the back stairs.

At the very least, the information provided by Nayati Johnson as to the three black males clearly would have flatly rebutted the state's claim that Mr. William's testimony was "an out and out lie."(R. F, 131)

The information provided in the aforementioned exhibits also provided the basis for a severence. This is because while it was exculpatory in nature in regards to Mr. Washington, it was inculpatory of his co-defendant, Pierre Willhite. And, the information would also have required Mr. Washington to call Robert Willhite, the brother of Pierre Willhite, to testify. Mr. Washington's defense would clearly have been antagonistic to that of Willhite. Thus, it would have been clear that a joint trial in this case would be unfair to both defendants.

Given that the state's case against Darryl Washington hinged soley on the dubious "eye-witness" identification provided by state's witness Sylvia Ramos, the balance would have tipped greatly in favor of aquittal with respect to Mr. Washington had his counsel investigated or developed the information contained int the attached hereto exhibits. Therefore, Mr. Washington's conviction should be reversed and the cause remanded for a new trial.

II

DARRYL WASHINGTON WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
ON DIRECT APPEAL WHERE APPOINTED COUNSEL FAILED TO ARGUE ON APPEAL THE
POLICE LACKED PROBABLE CAUSE TO ARREST AND DETAIN MR. WASHINGTON BASED
SOLEY ON A DEAPARTMENTAL "STOP ORDER" ISSUED BY AN OFFICER IN LIEU OF
AN ARREST WARRANT.

Prior to trial defense counsel moved to quash Mr. Washington's January 24,

1994, arrest by Chicago Police and all evidence derived therefrom. The basis

for this motion was that the arrest was without probable cause where no warrant

existed; and, where a "Stop Order" was the sole basis for continued detainment.

(CLR at 15).

On direct appeal, appellate counsel merely argued that the informant whom

called 911 and told police a person who was wanted for murder could be found

at the Wicker Park fieldhouse was insufficient to establish probable cause to

justify arresting Mr. Washington.

As a result of appellate counsel's failure to brief the properly preserved

issue, the Illinois Appellate Court found it significant that a "Stop Order"

was issued for Mr. Washington when determing that the arrest in this case was

not based soley on information provided by an informant. (See, Exhibit D) And,

had th issue been briefed, the Appellate Court would, as a prerequisite, have

had to resolve the isuue of the constitutionality of allowing citizens to be

arrested and detained based soley on the discretionary issuance of an inter-

deaprtmental law enforcement "Stop Order", "memo" or "bulletin". Had this issue

been examined, the Illinois Appellate Court would have been compelled under the

principle of stare decisis to follow the rule of Brown v. Texas, 443 U.S., 52

(that the issue was one which must be examined to eliminate "the risk of arb-

itrary and abusive police practices [exceeding] tolerable limits".). In turn,

the practice would not, nor could not, be deemed an appropriate subsitute for

an arrest warrant.

III

THE FAILURE OF PETITIONER'S COUNSEL ON DIRECT APPEAL TO RAISE A
PROPERLY PRESERVED CLAIM WHICH WOULD HAVE RESULTED IN REVERSAL OF
HIS CONVICTION DEPRIVED HIM OF EFFECTIVE ASSISTANCE OF COUNSEL.

On Petitioner's direct appeal he was deprived of effective
assistance of counsel due to counsel's failure to allege as error
that the in-court identification by Sulvio Ramos was tainted and
suggestive, that she was allowed to "thrid guess" one of her
alleged offenders, Darryl Washington.

Because there is a reasonable probabilty that his conviction
would have been reversed on appeal had this issue been raised,
this court should vacate the Petitioners sentence and conviction
and grant him a new trial or, at the very least, remand for an
evidentiary hearing. (U.S. Const. VI, XIV.)

In order to establish a claim of ineffective assistance of
counsel, a defendant must show 1) that counsel's acts or ommissions
were "outside the range of professionally competent assistance"
and 2) that "there is a reasonable probability that but for
counsel's unprofessional errors, the result of the proceedings
would have been different. This standard applies to counsel on
direct appeal.

When a defendant maintains that his appellate counsel was
ineffective for failing to argue a particular issue, he must show
that counsel's failure to raise that issue was objectively unreason-
able and that there is a reasonable probability that, but for
this failure, his convictions would have been reversed.

In this case, Sulvia Ramos testified at the joint trial of Petitioner, Darryl Washington and Pierre Willhite. Ms. Ramos said that when she viewed the photos at the request of Detective Morch she was unsure that Mr. Washington had been one of the offenders she further testified that only one person entered the apartment and began shooting. When asked to describe that person Ms. Ramos could only state " well, I knew he was dark black ". When asked to make an in-court identification of the person whom she saw enter the apartment and shoot, Ms. Ramos twice identified pierre Willhite as the shooter in open court until the State's attorney insisted Ms. Ramos not only be given a thrid opportunity to identify Petitioner, but be allowed to leave the witness stand to do so.

Under cross-examination, Ms. Ramos admitted prior to testifying that day, the State's attorney had shown her the photograph of Petitioner and told her his name and that they were going to show her some photographs when she testified..

This identification was tainted and suggestive, and that it is entitled to no weight. Ms.Ramos had viewed photographs which includeed the Petitioner, but she did not identify him from December 1993 until January 1998, and then she did so after misidentify the Petitioner twice in open court.

There was no evidence that Ms. Ramos had mentioned a scar on the Petitioner's nose when she talked to the police. Ms Ramos was pressured into making an in-court identification of the Petitioner. She was shown a photograph of Petitioner Darryl Washington in the State's attorney's office. She knew that Mr. Washington was one of the person's charged by the State. Ms. Ramos in-court identifica-tion was tainted and not credible.

Mr. Washington had bben mistakenly identified as one of the offenders. This error was obvious and reversible error. It is impossible to even hypothesize stategic reason for not raising this issue on direct appeal.

Appellate counsel's failure to raiae this meritorious issue was therefore incompetent and prejudicial. Accordingly, this court should reverse Petitioner's conviction and remand the cause for a new trial or in the alternative, remand for an remand for evidentiary hearing.

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION **FILED**

MAR 0 9 2004

DARRYL WASHINGTON )
      Petitioner, )

**DOROTHY BROWN**
CLERK OF CIRCUIT COURT

          vs. ) NO. 94CR25737

PEOPLE OF THE STATE OF ILLINOIS, )
      Respondent. )

### PARTIAL SECOND SUPPLEMENTAL PETITION FOR POST CONVICTION RELIEF AND REQUEST FOR ADDITIONAL TIME TO INTERVIEW WITNESS

Now comes the Petitioner, Darryl Washington, through his attorney, Edwin A. Burnette, Cook County Public Defender, by Assistant Public Defender, Winona Agbabiaka, and presents this Supplemental Petition for Post Conviction Relief, pursuant to the Illinois Post Conviction Hearing Act, 725 ILCS 5/122-1 et seq., which supplements, but does not replace, his original *pro se* Petition for Post Conviction relief and his Partial Supplemental Petition for Post Conviction relief.

### GENERAL BACKGROUND

1.    Following a jury trial before the Honorable Thomas A.Hett, petitioner was convicted of Murder, Home Invation and Aggravated Battery with a Firearm.

2.    Petitioner was subsequently sentenced to 66 years in the Illinois Department of Corrections.

3.    Petitioner's Murder conviction was affirmed on appeal on June 14,

-1-

1999 in consolidated appellate case Nos. 1-98-0225 and 1-98-0984

4.    Petitioner filed his *pro se* petition for Post Conviction relief by mail on

June 5, 2000. The petition was filed stamped on December 8, 2000.

5.    In September 2000, the office of the Cook County Public Defender

was appointed to represent petitioner.

6.    On , April 11, 2001, this case was reassigned to Assistant Public

Defender Winona J. Agbabiaka.

7.    On June 25, 2001, a partial supplemental Post Conviction Petition

based on *Apprendi* was filed on Petitioner's behalf.

## CONSTITUTIONAL ISSUES

I.

PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE
COUNSEL FAILED TO REQUEST POLICE REPORTS,
INTERVIEW WITNESSES OR INVESTIGATE THE ARRESTS OF
NAYATI JOHNSON, ZURIEL JOHNSON, OR ROBERT
WILLHITE FOR UUW IN THE ALLEY BEHIND THE BUILDING AT
2051 WEST DIVISION STREET, CHICAGO ON THE DATE OF
THE SHOOTINGS FOR WHICH PETITIONER WAS TRIED AND
CONVICTED.

The constitutionally guaranteed assistance of counsel has not been

provided if the defendant can prove that counsel's representation fell below an

objective standard of reasonableness and that counsel's shortcomings were so

serious as to deprive the defendant of a fair trial with a reliable result. *People v.*

*Albanese,* 104 Ill. 2d 504, 525, 473 N.E.2d 1246 (1984). The defendant must

establish that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.

*Albanese,* 104 Ill. 2d at 525. Failure to adequately prepare for trial, including

failure to conduct an investigation and interview witnesses, has been held to

constitute inadequate representation by counsel. *People v. Witherspoon,* 55 Ill.

2d 18, 21, 302 N.e. 2d 3, 4 (1973). The failure to interview witnesses may indicate

actual incompetence, particularly when the witnesses are known to trial counsel

and their testimony may be exonerating. *People v. Barry,* 202 Ill. App. 3d 212,

559 N.E. 2d 919 (1990); *People v. Greer,* 79 Ill. 2d 103, 123, 402 N.E.2d 203, 212

(1980).   Moreover, adequate representation involves more than the courtroom

conduct of the advocate. The exercise of the utmost skill during trial is not

enough if counsel has neglected the necessary investigation and preparation of

the case or so failed to interview essential witnesses or to arrange for their

attendance. Such omissions, of course, will rarely be visible on the surface of the

trial, and to that extent the impression of a trial judge [or reviewing judge]

regarding the skill and ability of counsel will be incomplete. *People v. Davis,* 203

Ill. App. 3d 129, 560 N.E.2d 1072 (1990).

In the present case, trial counsel's failure to interview witnesses Nayati

Johnson, Robert Willhite, and Zuriel O. Johnson fell below a reasonable level of

representation. According to the police reports available to defense counsel at

the time of trial, Willhite, Nayati Johnson and Zuriel Johnson were arrested in the

alley behind 2051 West Division immediately following the shooting. (Exhibit A -

police report). Moreover, a gun was found in the vehicle in which these three

suspects were located, they were arrested and charged with UUW, and gunshot

residue tests were performed. (Exhibit A ) In addition, one of the suspects,

Robert Willhite was the brother of co-defendant Pierre Willhite. (Exhibit A) The

ineffectiveness of trial counsel is further highlighted by the fact that by the time

that post conviction counsel litigated and was finally granted a request to

subpoena the arrest reports and gunshot residue reports of Robert Willhite,

Nayati Johnson and Zuriel Johnson, they had already been destroyed. (Exhibit B

Motion to Subpoena Police Reports; Subpoena Request and Response thereto.)

Counsel for petitioner should have requested copies of these reports at the time

of trial when they would have been readily available.

In addition, trial counsel's failure to promptly interview these witnesses and

investigate their arrests, resulted in the destruction of their weapons and results

their gunshot residue tests which may have had potentially exculpatory value in

petitioner's trial. Where trial counsel fails to obtain available evidence to

support his client's defense, his failure cannot be deemed an informed tactical

decision if he never reviewed the evidence in question. People v. Truly, 230 Ill.

App. 3d 948, 595 N.E.2d 1230, 1235 (1992). Moreover, trial counsel cannot be

deemed to have made a strategic decision not to present a defense or a

-4-

witness where no contact has been made with the witnesses and thus the

attorney is not aware of what the content of their testimony might be. *Truly*, 595

N.E.2d at 1234, 172 Ill. Dec. at 564. Failure to adequately investigate and

develop an available defense has been found to constitute ineffective

assistance of counsel. *People v. Garza*, 180 Ill. App 3d 263, 535 N.E.2d 968 (1st

Dist. 1989); *People v. Wright*, 111 Ill. 2d 18, 488 N.E.2d 973 (1986).

II.

POST CONVICTION COUNSEL SEEKS ADDITIONAL TIME TO

SUPPLEMENT THIS POST CONVICTION PETITION WITH THE AFFIDAVIT

OF WITNESS ROBERT WILLHITE.

To date, post conviction counsel has been unable to obtain an interview

with witness Robert Willhite. Counsel requests additional time to interview Willhite

and supplement this petition with any information or affidavits obtained.

## CONCLUSION

WHEREFORE, petitioner, Darryl Washington prays that this Honorable Court grant him the following relief on his Post Conviction Petition:

1. That his conviction be reversed and he be given a new trial; or

2. That an evidentiary hearing be granted and/or;

3. That he be granted such other and further relief as this court deems appropriate.

Respectfully submitted,

Winona J. Agbabiaka
Assistant Public Defender

Atty. No. 30295
Edwin A. Burnette, Public Defender
Winona J. Agbabiaka, Assistant Public Defender
2245 West Ogden 7th Floor
Chicago, IL 60612
(312) 433-7460

FILED

OCT 2 4 2005

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| ~~Plaintiff-Respondent,~~ | ) | ~~Post-Conviction~~ |
| | ) | |
| v. | ) | No. 94 CR 25737 |
| | ) | |
| DARRYL WASHINGTON, | ) | Hon. Bertina E. Lampkin, |
| | ) | Judge Presiding. |
| Defendant-Petitioner. | ) | |

## RULING ON RESPONDENT'S MOTION TO
## DISMISS PETITION FOR POST-CONVICTION RELIEF

Petitioner, Darryl Washington, seeks post-conviction relief from the judgment of

conviction entered against him on September 9, 1997. Following a jury trial, petitioner was

convicted of first degree murder, home invasion, and aggravated battery with a firearm, and was

sentenced to 66 years' imprisonment. As grounds for relief, petitioner claims: (1) he received

ineffective assistance of counsel when trial counsel failed to investigate or interview three

individuals; (2) appellate counsel was ineffective for failing to challenge petitioner's arrest on the

basis of a stop order and failing to challenge the State's use of Sylvia Ramos' in-court

identification of petitioner; and (3) *Apprendi* bars the imposition of his sentence.

## BACKGROUND[1]

On December 5, 1993, about 6:30 p.m., Pierre Willhite was at 2051 West Division

Street where he saw Dalila Robles, and asked whether her boyfriend Elvis Valentin was home.

Dalila checked for Elvis at his third-floor apartment and told him there was a "Prieto" looking for

~~him. Willhite took exception to this derogatory remark, and argued with Dalila upon her return.~~

---

[1] Facts within background are taken from those contained in *People v. Washington*, No. 1-98-0225, unpublished
pursuant to Supreme Court Rule 23.

Elvis heard the argument and intervened. Elvis punched Willhite in the face causing Willhite to leave the complex yelling, "I'll be back."

At this same time Edmond Green and Edgar Perez were on the second-floor and heard the argument. Perez witnessed the fight and saw Willhite leave. Perez and Green then left that apartment and went to a friend's house. A short time later, they received a telephone call from Elvis who was seeking them to come back. As they walked back to 2051 West Division Street, Perez saw three black men get out of a car and enter the building. As Green and Perez walked up the stairs, they saw the three men come down the stairs.

After the two men entered Elvis' apartment, they heard a knock on the door. Perez saw Green open the door and heard him say that Elvis was not at home. At that moment the person on the other side shoved the door open and fired, striking Green above the left eye. Perez ushered several children to safety. Perez then ran into Elvis' room where Sylvia Ramos was hiding when he heard several more gunshots. When he finally returned to the living room, Perez saw Green lying in a pool of blood. Luis Cruz had also been shot in the leg. Green died as a result of the gunshot wound to his head and his back.

Detective David March testified that he was assigned to the investigation of the homicide of Edmond Green, and on December 5, 1993, he interviewed witnesses and was given a description of three men involved in this crime. Also, Elvis Valentin identified on e offender as someone named "Pierre" who he had seen before in the neighborhood. Detective March learned that Edgar Perez had seen the shooting and looked for him, but did not interview him until December 10, 1993. March stated that during this interview Perez did not claim to have seen the person who shot Green, but he fled into a bedroom when the shooting began. However,

Perez testified that when interviewed, he told March that he recognized the shooter from the neighborhood.

Detective March also interviewed Luis Cruz on or about December 10, 1993, after he was released from the hospital. Cruz said that shortly before the shooting, ~~████████████~~ told him one of the men was nicknamed "Gooch." He also said that shortly after the release he had been talking with people who identified the two assailants nicknam██ ██████ and "Pierre"; and all frequented Wicker Park. Detective March proceeded to Wicker Park where he spoke with a park employee, who said that the three individuals were Vice Lords and gave the police a description of Gooch and Scooter. The police followed up on the information and found "Pierre" to be the codefendant, Pierre Willhite.

Detective March further said that on December 18, 1993, he asked the police in the area of Wicker Park for any files on a person called, "Scooter," and was told that "Scooter" was defendant. Defendant's picture was then shown to Sylvia Ramos that same day, and she tentatively identified defendant. On January 12, 1994, Edgar Perez positively identified codefendant from a photo array but could not identify defendant except to say that he was codefendant's friend. A "stop order" was then issued for defendant.

On January 20, 1994, about 8:21 p.m. Chicago police officer Caesar Echevarria and Officer Motzny arrested defendant after learning over dispatch that a man wanted for a homicide was at the Wicker Park field house wearing a purple jacket with the cartoon character Tweetie Bird on it. The officers were in full uniform, and when they entered the field house they saw defendant who was wearing that style jacket. Defendant was using the telephone, and when he looked in the officer's direction he dropped the telephone and ran. Defendant was apprehended about 100 feet away. At the police station, Sylvia Ramos identified him as one of three people

3

who came to the apartment that day and began shoot. [*shooting*] On September 23, 1994, codefendant was arrested and Sylvia again identified [*co-*] defendant from a lineup as did Elvis and Delila. Elvis, Delila and Sylvia identified codefendant as being involved in the altercation that happened earlier on the evening of the shooting, and Edgar Perez identified codefendant as being involved in the shooting.

Before trial, defendant made a motion to quash his arrest and suppress his out-of-court identification. After hearing testimony from Officer Echevarria and Detective March, the court found that based on the totality of the evidence the police had probable cause to arrest defendant.

Both defendants called witnesses to testify that neither was present at the time of the crime. Codefendant called, among others, his brother and sister-in-law to establish that he was at their home at around 7:00 p.m. on December 5, 1993. The jury ultimately found both alibis unavailing and convicted both for the crimes of first degree murder and home invasion.

## PROCEDURAL HISTORY

A direct appeal was taken to the Illinois Appellate Court, First Judicial District, wherein petitioner contended that the police lacked probable cause for his arrest, and that he was denied a fair trial because of the prosecutor's highly inflammatory closing argument  On June 14, 1999, the appellate court affirmed petitioner's conviction and sentence in a consolidated opinion. *People v. Darryl Washington and Pierre Willhite*, No. 1-98-0225 and 1-98-0984 (unpublished order under Supreme Court Rule 23) (1999). The appellate court found specifically that "the information collectively known by the police in this case was sufficient to establish probable cause for defendant's arrest." *Mandate of the Appellate Court*, 12. Petitioner sought leave to appeal to the Illinois Supreme Court. However, his petition was denied on April 5, 2000. *People v. Darryl Washington, et al.*, 188 Ill. 2d 580 (2000).

4

## ANALYSIS

The instant procedure was commenced on June 5, 2000 and was thereafter supplemented on two occasions, the most recent of which was filed on June 25, 2001. In turn, respondent filed a motion to dismiss pursuant to Section 5 of the Post-Conviction Hearing Act. 725 ILCS 5/122-5 (West 2002). On March 9, 2004, appointed counsel filed a partial second supplemental petition realleging ineffective assistance of trial counsel for failing to interview witnesses or investigate the arrests of Nayati Johnson, Zuriel Johnson, or Robert Willhite in the alley behind the building where shootings occurred. Following arguments of counsel, this court took the matter under advisement.

At the outset, it is universally recognized that a post-conviction proceeding is not a direct appeal, but rather is a collateral attack on a prior judgment. *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Under the Act, a petitioner enjoys no entitlement to an evidentiary hearing. *People v. Cloutier*, 191 Ill. 2d 392, 397 (2000). A hearing is required, however, when the petitioner makes a substantial showing, based on the record and supportive affidavits, that a violation of his constitutional rights occurred at trial or sentencing. *People v. Johnson,* 191 Ill. 2d 257, 268 (2000).

### A.    Ineffective Assistance of Trial Counsel

Petitioner claims trial counsel was ineffective for failing to request police reports, interview witnesses or investigate the arrests of Nayati Johnson, Zuriel Johnson, or Robert Willhite for UUW in the alley behind the building at 2051 West Division Street in the early morning following the shooting. According to petitioner, a police report that shows codefendant's brother was present outside 2051 W. Division Street is exculpatory. He further alleges that these men were found to be in possession of two .25 caliber semi-automatic

handguns on which, an "Excam", blue steel, pistol matched the exact description of one of the weapons used in in [sic] shooting. *See Post-Conviction Petition*, June 8, 2000. Second, petitioner claims counsel failed to correctly question Miss Ramos about her identification of Washington in open court.

In examining petitioner's claims of ineffective assistance of counsel, this court follows the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under this standard, petitioner must show that counsel's representation fell below an objective standard of reasonableness, and that but for this deficiency, there is a reasonable probability that counsel's performance was prejudicial to the defense. *People v. Hickey*, 204 Ill. 2d 585, 613 (2001). "Prejudice exists when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *People v. Erickson*, 183 Ill. 2d 213, 224, 700 N.E.2d 1027, 1032 (1998) (citations omitted). A petitioner's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats a claim of ineffectiveness. *People v. Morgan*, 187 Ill. 2d 500, 529-30 (1999).

Significantly, effective assistance of counsel in a constitutional sense means competent, not perfect, representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). Notably, courts indulge in the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 690 (2001). Moreover, "the fact that another attorney might have pursued a different strategy is not a factor in the competency determination." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994) (citing *People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988)).

Further, counsel's strategic decisions will not be second-guessed. Indeed, to ruminate over the wisdom of counsel's advice is precisely the kind of retrospection proscribed by

6

*Strickland* and its progeny. *See Strickland*, 466 U.S. at 689 ("[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *see also People v. Fuller*, 205 Ill. 2d 308, 331 (2002) (issues of trial strategy must be viewed, not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions).

Challenges to trial counsel's representation ordinarily are not cognizable under the Act unless the claim regards a matter outside the trial record. *People v. Britz*, 174 Ill. 2d 163, 178-79 (1996); *People v. Coleman*, 267 Ill. App. 3d 895, 898-99 (1st Dist. 1994). In the instant matter, petitioner's claim regarding trial counsel's competence with regards to the State's in-court identification is premised on the trial record and, accordingly, the doctrine of ███████████ consideration thereof. Additionally, trial counsel's failure to object to the State's identification is a matter of trial strategy and should not be second-guessed now more than nine years later.

### 1.    Failure to Investigate Police Reports

Petitioner claims he was prejudiced by trial counsel's failure to introduce into evidence a police report generated during the early morning of December 6, 1993. Petitioner holds that counsel's decision not to utilize this available evidence amounts to deficient performance and somehow he was prejudiced.

Defense counsel's failure to adequately prepare for trial or to conduct adequate investigations may support an ineffectiveness claim. *People v. Witherspoon*, 55 Ill. 2d 18, 21 (1973); *People v. Coleman*, 267 Ill. App. 3d 895, 900 (1st Dist. 1994). However, "a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). Indeed, "to prevail on a claim of ineffective assistance for failure to

investigate, petitioner must show that substantial prejudice resulted and that there is a reasonable probability the final result would have been different had counsel properly investigated." *People v. Rush*, 294 Ill. App. 3d 334, 342-43 (5th Dist. 1998).

Petitioner fails on both counts. First, petitioner fails to show how the police report was exculpatory of petitioner. Rather petitioner surmises the police report could have implicated three others in the shooting. He fails to connect how the presence of these three youths in the alley behind the crime scene hours after the crime tends to absolve him from guilt especially when it turns out Robert Willhite is the brother of Pierre Willhite. Indeed, nothing in the police report is inconsistent with the State's case. This fact could indeed **inculpate** petitioner because it would link his codefendant more closely to the crime. Counsel's choice not to rely on this police report and to confront the State's evidence is actually good trial strategy and cannot be deemed deficient from the allegations in the petition.

Also, petitioner cannot show sufficient prejudice because there is not a reasonable probability the outcome of the trial would have been different if the jury had this evidence before them. In fact, the jury could review this police report and believe that the codefendant's brother was near 2051 West Division Street to either recover guns used at the crime scene or to provide "back up" to Willhite and petitioner. In any case, Petitioner fails to make a substantial showing of a constitutional deprivation.

**B.    Ineffective Assistance of Appellate Counsel**

Petitioner next claims appellate counsel was ineffective for failing to argue on appeal that the police probable cause to arrest and detain Mr. Washington based on a departmental "stop order" issued by an officer instead of an arrest warrant. This assertion is contradicted by the mandate issued by the appellate court.

8

### 1.    Failure to Brief Illegal Stop

On appeal, defendant contended that police lacked probable cause for his arrest. In its

lengthy order, the appellate court thoroughly explained then existing law and the circumstances

of petitioner's case as follows:

"Whether probable cause exists is a commonsense practical question to be determined upon examination of the totality of the circumstances presented. *People v. Robinson*, 167 Ill. 2d 397, 405 (1995). To determine whether a warrantless arrest is based on sufficient probable cause, the trial court must decide whether a reasonable and prudent person, having knowledge possessed by the officers at the time of the arrest would believe the defendant committed an offense. *People v. Lippert*, 89 Ill. 2d 171, 178 (1982). The police need not possess evidence sufficient to convict, but need only have knowledge of facts which would lead a reasonable person to believe that a crime has been committed by the defendant. *People v. Neal*, 111 Ill. 2d 180, 193 (1985). Furthermore when police officers are working together to investigate a crime or possible crime, probable cause may be established from their collective knowledge even if it is was not within the personal knowledge of the arresting officer. *People v. Hendricks*, 253 Ill. App. 3d 78, 89 (1993).

At the time of the arrest, the police knew that a shooting had occurred, and that about an hour earlier there had been an altercation between Elvis Valentin and codefendant. The police were told that three individuals, "Gooch", "Scooter", and "Pierre" were the shooters, and they frequented the Wicker Park field house. The police identified Pierre as codefendant, went to Wicker Park, were given a description of the suspects, and were told that they often came to the field house.

Detective then contacted the local police district and asked for a name search in the nickname file for "Scooter." They received defendant's name. The police then obtained defendant's picture and showed it to one of the witnesses [Sylvia Ramos] who identified defendant as one of the shooters. Based on that information, the detectives submitted a "stop order" for defendant. Next, detectives showed defendant's picture to another witness, who identified codefendant as the shooter and defendant as one of his friends. A few days later, Officer Echevarria was on routine patrol in the Wicker Park area when he received a message which indicated that an anonymous caller had notified police that a murder suspect was in the Wicker Park field house, and was wearing a purple jacket with a cartoon character on it. As the officers entered the field house, they saw defendant wearing his type of jacket. When defendant saw the officers, he ran.

9

To support his argument defendant contends that the anonymous tip was insufficient, and the identification by the witness was insufficient for the arrest. However, all of the events taken together determine probable cause."

*Mandate of the Appellate Court*, 10-11.

As plainly clear, petitioner has raised the issue of his arrest on direct appeal and therefore, the claim of counsel's ineffectiveness is not only false but the substance of the claim is now barred by *res judicata*. In Illinois, the law is clear: "Rulings on issues that were previously raised at trial or on direct appeal are *res judicata*, and issues that could have been raised, but were not, are waived." *People v. Miller*, 203 Ill. 2d 433, 437 (2002).

### 2.    Failure to Allege as Error In-Court Identification

Petitioner next contends he was deprived of effective assistance of counsel on direct appeal when counsel failed to allege as error the in-court identification by Sylvia Ramos was tainted and suggestive.

To succeed on a claim of ineffective assistance of appellate counsel, petitioner must show that the failure to raise a particular issue was objectively unreasonable and that his appeal was prejudiced by the omission. *People v. Williams*, 209 Ill. 2d 227, 243 (2004). "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Thus, petitioner has not suffered prejudice from appellate counsel's decision not to raise certain issues on appeal unless such issues were meritorious. *Id.* at 329.

Here, the court declines to deem "patently erroneous" appellate counsel's assessment of the record and decision not to raise the issue of petitioner's in-court identification. Moreover, petitioner has failed to establish that had appellate counsel raised the above listed issues, his

conviction or sentence would have been reversed. "A petitioner's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim." *People v. Palmer*, 162 Ill. 2d 465, 475-76 (1994) (emphasis added) (citations omitted).

## C.    Apprendi

Petitioner claims that his sentence of 66 years (60 for first degree murder to run consecutive with 6 for home invasion) is unconstitutional because it was based on a finding that the crime was brutal and heinous, elements which were not included in the indictment nor proven beyond a reasonable doubt. Petitioner relies on *Apprendi v. New Jersey*, 540 U.S. 446 (2000) and several other cases decided in its wake. In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 540 U.S. at 490.

However, in *People v. De La Paz*, No. 93208, slip op. at 1 (Sup. Ct. Ill. May 8, 2003), the Illinois Supreme Court held that "*Apprendi* does not apply retroactively to causes in which the direct appeal process had concluded at the time that *Apprendi* was decided." In 1999, the appellate court affirmed petitioner's sentence and conviction. *People v. Darryl Washington and Pierre Willhite*, No. 1-98-0225 and 1-98-0984 (unpublished order under Supreme Court Rule 23) (1999). Petitioner sought leave to appeal to the Illinois Supreme Court. However, his petition was denied on April 5, 2000. *People v. Darryl Washington, et al.*, 188 Ill. 2d 580 (2000). *Apprendi* was decided on June 26, 2000. Thus, because petitioner's direct appeal process had concluded before *Apprendi* was announced, the decision affords no basis for relief in petitioner's case.

Petitioner's reliance on *Apprendi* is unavailing for another reason. The Supreme Court in *Apprendi* "specifically stated that consecutive sentencing was 'not relevant' to the 'narrow issue' under consideration." *People v. Wagener*, 2001 Ill. LEXIS 492, *30 (2001). The Illinois Supreme Court in *People v. Carney* held that consecutive sentences constitute separate sentences for each crime of which a defendant has been convicted. *People v. Carney*, 2001 Ill. LEXIS 779, *17 (2001). The sentencing range for first degree murder in petitioner's case is not less than 20 years and not more than 60 years (730 ILCS 5/5-8-1(a)(3) (West 1994) and the sentencing range for invasion is a term of not less than 6 years and not more than 30 years (730 ILCS 5/5-8-1(a)(3) (West 2000). Neither of petitioner's separate sentences exceed the maximum sentence for each offense. The maximum sentence petitioner could have received under the statutes is 90 years. *Apprendi* is inapplicable to his sentence because it does not apply to consecutives sentences well-within statutory range.

## CONCLUSION

Based on the foregoing discussion, the court finds that the matters raised by Petitioner are frivolous and patently without merit. Accordingly, Petitioner's *pro se* petition shall be and is hereby dismissed.

ENTERED

JUDGE BERTINA LAMPKIN-0250

OCT 2 4 2005

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

ENTERED: _____
Hon. Bertina E. Lampkin
Circuit Court of Cook County
Criminal Division

DATE: _____10/24/05_____

12

105833

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
**SUPREME COURT BUILDING**
**SPRINGFIELD, ILLINOIS 62701**
**(217) 782-2035**

March 26, 2008

Mr. Darryl Washington
Reg. No. K-62037
Hill Correctional Center
P. O. Box 1700
Galesburg, IL 61401

No. 105833 - People State of Illinois, respondent, v. Darryl
            Washington, petitioner.  Leave to appeal,
            Appellate Court, First District.

    The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.

    The mandate of this Court will issue to the Appellate Court

on April 30, 2008.

1      A.    They came to the house.

2      Q.    Okay.  And when they came to the house,

3  what did they do?

4      A.    They brought some pictures.

5      Q.    And did you look at those pictures?

6      A.    Yes.

7      Q.    And did you identify anybody in any --

8  how many pictures did you look at if you know?

9      A.    Five.

10     Q.    Okay.  And did you recognize anybody in

11  any of the five pictures?

12     A.    Yes.

13     Q.    And when you looked at the five pictures,

14  what did you tell the police about the one that

15  you recognized?

16     A.    That he had a mark in his nose.

17     Q.    That who had a mark on his nose?

18     A.    Darryl Washington.

19     Q.    When -- without getting into the mark on

20  the nose, when you looked at that picture, what

21  did you tell the police about that person, about

22  how it is that you recognized that person?

23     A.    That it look like him, but I would have

24  to see him in person to be sure.

1      Q.    Sasha was in the kitchen; correct?

2      A.    Yes, at the table eating.

3      Q.    So you turned around and went to the

4    kitchen; correct?

5      A.    Yes.

6      Q.    And you picked up Sasha, and you took her

7    into the pantry; correct?

8      A.    Yes.

9      Q.    The pantry is all the way at the back end

10    of the apartment?

11     A.    No, it's not too far.  It's not too far

12    back.  It's right there.

13     Q.    It's not in the hallway, is it?

14     A.    No.

15     Q.    It's in back of the kitchen; correct?

16     A.    Well, there is the kitchen, and the

17    pantry is right there.

18     Q.    Your testimony is that you placed your

19    daughter, Sasha, in the pantry; correct?

20     A.    Mm-hmm, yes, and my mother, also.

21     Q.    I'm sorry?  And your mother, also?

22     A.    Yes.

23     Q.    Your mother went back there, too?

24     A.    I put her there.

C-176

1      Q.   So you not only took the time to take

2    Sasha and put her in the pantry, you took the time

3    to take your mother as well into the pantry?

4      A.   Because when Edmund and Luis fell, they

5    couldn't pull the door.  So I pulled Luis Perez to

6    pull the door.

7      Q.   And then you took -- you went back to the

8    kitchen and placed Sasha into the pantry?

9      A.   No.  When Edmund and Luis Cruz couldn't

10   hold the door anymore, when they fell on the

11   ground, we run to the kitchen to try to open the

12   door, and then I told Juan Lopez to open the door

13   while I was watching.

14     Q.   Where was Juan Lopez?

15     A.   He was at the table eating.

16     Q.   I'm sorry?

17     A.   He was at the table on the side eating.

18     Q.   Juan Lopez was eating?

19     A.   Yes, he was eating.

20     Q.   While Edmund Green is being shot and Luis

21   Cruz is being shot?

22     A.   No, no, no.  No, I pulled Juan Lopez to

23   open the back door.

24     Q.   Okay.  Let's say -- all right.  You're

1    asking Juan Lopez to open the back door?

2        A.   Yes.

3        Q.   Have you heard shots yet?

4        A.   Yes, because they couldn't hold the door

5    anymore.

6        Q.   Okay.  So Edmund and Luis are trying to

7    keep the door closed, you have heard shots?

8        A.   Yes, they were on the floor.  They were

9    on the floor already.  There was no time to get

10   out from the back door.

11       Q.   And while you heard shots, that's when

12   you went to ask Mr. Lopez to open the back door;

13   correct?

14       A.   To be able to get out of there.

15       Q.   Right.  You wanted to get out?

16       A.   Yes.

17       Q.   Okay.  And you were asking Mr. Lopez to

18   help you open the back door?

19       A.   Yes, and I was watching.

20       Q.   And Mr. Lopez was eating?

21       A.   Well, he stopped eating once they

22   couldn't hold the door closed anymore.

23       Q.   So you tried to open the back door with

24   Mr. Lopez?

C-178

1       A.   No.   He was trying to open the back door,

2   and I was watching so they could not come in.   If

3   they would have come in the house --

4       Q.   I'm sorry.   You were watching so they

5   couldn't come in?

6       A.   I was watching Juan Lopez in case that

7   they would shoot at him.

8       Q.   You were watching Juan Lopez?

9       A.   Yes, because he had problems opening the

10  door.

11      Q.   We're talking about the back door off of

12  the kitchen; correct?

13      A.   Yes.

14      Q.   Not the front door where Mr. -- where

15  Edmund Green was; correct?   And Luis Cruz?

16      A.   No.

17      Q.   You're trying to get out the back

18  way?

19      A.   Yes.

20      Q.   And not being able to get out the back

21  door, that's when you took Sasha and placed her in

22  the pantry; correct?

23      A.   No.

24      Q.   You did that afterwards?

1      A.    After I heard the first shot, I put her

2    immediately in the pantry.

3      Q.    And then you tried to get out the back

4    door?

5      A.    Juan Lopez was trying to open the back

6    door.

7      Q.    Okay.  And you also then helped your

8    mother get in the pantry, too; correct?

9      A.    Yes.  Because I didn't want to see my

10   mother right there on the floor.

11     Q.    The shots happened quickly?

12     A.    Yes.

13     Q.    It was over with in a matter of seconds;

14   correct?

15     A.    I don't remember.  There were many of

16   them.

17     Q.    And you stayed back in the back with your

18   daughter and your mother; correct?

19     A.    No.  I was right next to the -- close to

20   the sink where the hallway is.

21     Q.    You put your daughter in the pantry

22   because it was a safer area than the kitchen;

23   correct?

24     A.    Yes.

1    Q.    You escorted your mother into the pantry

2    because it was a safer area than the kitchen;

3    correct?

4    A.    Yes.

5    Q.    And you're telling the ladies and

6    gentlemen of the jury that you did not remain in

7    the pantry?

8    A.    No.

9    Q.    You chose to go from a safer area to a

10   more dangerous area?

11   A.    I do not understand.

12   Q.    Miss Ramos, I'm going to ask you some

13   questions about when the police officers came.

14   They asked for a description?

15   A.    I'm sorry.  Will you repeat that?

16   Q.    When the police officers came shortly

17   after the shooting stopped, they asked you some

18   questions about what happened?

19   A.    Yes.

20   Q.    And they asked you some questions about

21   the description --

22   A.    Yes.

23   Q.    -- of anyone that you saw?

24   A.    How were they dressed?

1        Q.    I'm sorry?

2        A.    Excuse me?

3        Q.    They asked you if you could provide a

4    description of anyone that you saw?

5        A.    Yes.

6        Q.    You're telling us today you saw only

7    one?

8        A.    Yes, the one that came in the house.

9        Q.    And you did not tell any officer that

10    evening that that person had a mark on his nose;

11    correct?

12        A.    Yes.

13        Q.    Yes, you did, or, yes, you did not?

14        A.    Yes.    They asked me questions, and I told

15    them, yes.

16        Q.    You did not tell those officers that this

17    person who shot at you had a mark on his nose?

18        A.    I told them.

19        Q.    Who did you tell that to?

20        A.    I don't know the names of the officers.

21    There were many of them.

22        Q.    How many officers did you tell that to?

23        A.    There were many of them asking questions.

24        Q.    Did you tell all of them?

1     A.    Some of them.  I don't remember.

2     Q.    You told some of them?

3     A.    Yes.

4     Q.    But not all of them?

5     A.    Only the ones that wanted to speak to us.

6     Q.    Well, how many wanted to speak to you?

7     A.    There were so many of them, but I don't

8    remember their names.

9     Q.    Okay.  I'm not asking you their names,

10    but some that were asking you questions were

11    speaking Spanish; correct?

12    A.    Yes.

13    Q.    They asked you to take your time, try to

14    remember what happened?

15    A.    Yes.

16    Q.    And to tell them -- give them as best you

17    could a description of who did this?

18    A.    Yes.

19    Q.    And you tried to do that; correct?

20    A.    Yes.

21    Q.    The police officers asked you the race of

22    the offender; correct?

23    A.    Yes.

24    Q.    The gender?  In other words, man or

1     woman?

2          A.    Yes.

3          Q.    Approximate height?

4          A.    I don't remember that.

5          Q.    They didn't ask -- did you provide them a

6     height?

7          A.    Five nine, five eight, around there.

8     Five nine, around there.

9          Q.    Five nine, around there?

10         A.    Yes.

11         Q.    So you do remember if they asked you

12    about a height?

13         A.    Yes.  Now that I'm thinking, yes.

14         Q.    Are you sure you didn't say six two?

15         A.    No.

16         Q.    Let me ask you this question.  Did they

17    ask you what the guy was wearing?

18         A.    No.  Only the jacket.

19         Q.    I'm sorry?

20         A.    Only the jacket that had black.

21         Q.    A black jacket?

22         A.    Yes.

23         Q.    Was it a dark, long trench coat?

24         A.    No.

1    Q.    Besides the jacket, were you able to tell

2    the officers what other types of clothing he was

3    wearing?

4    A.    The only thing I saw was the whole thing

5    was black.  It was black.  They were black pants,

6    everything black.

7    Q.    Everything black?

8    A.    And he had a red cap.

9    Q.    Oh, a red cap?

10    A.    Well, it was not a cap.  It was one of

11    those hats that is round, knit.

12    Q.    Did you tell the officer -- are you

13    telling us that you told that officer who was

14    asking you questions about the clothing

15    description that this person had a mark on his

16    nose?

17          MR. NOLAN:  Objection, asked and

18    answered.

19          THE COURT:  Overruled.

20    BY THE WITNESS:

21    A.    Yes.

22    BY MR. MULLENIX:

23    Q.    Okay.  Do you recall if that officer was

24    named Restis?

1       A.    I don't remember.

2       Q.    Do you remember being interviewed that

3   evening about what happened?

4       A.    Excuse me?

5       Q.    Well, you saw one person come into the

6   apartment; correct?

7       A.    Yes.

8       Q.    You didn't see two or three come into the

9   apartment; correct?

10      A.    No.

11      Q.    Do you recall that evening being

12  questioned on December 5, 1993, by an officer and

13  telling that officer that you were in the kitchen,

14  and Green answered the door, and three male blacks

15  pushed their way in and started shooting?  Do you

16  recall telling Officer Restis that?

17      A.    I didn't see the other two.

18      Q.    My question is, do you recall telling

19  Officer Restis that?

20      A.    No.

21      Q.    You don't recall that?

22      A.    No, I don't remember.  That happened a

23  long time ago.

24      Q.    I realize that.  Do you recall telling

# ARREST REPORT
CPD-11 420 (REV. 6/92)

**NAME (LAST - FIRST - MIDDLE)** BENSON, NATAN

**ALIAS OR NICKNAME** "Chimp"

**CB NO** "Chimp"

**2 SEX** M **3 RACE** **4 AGE** 19 **5 DATE OF BIRTH** 06 APR 74

**8 DIST. RES.** 011 **9 HEIGHT** 400 **10 WEIGHT** 095 **11 HAIR** BROWN **12 HAIR STYLE** BRN **17 EYES** **1A COMPLEXION** DARK

**15 I.R. NO** 349-80-681?

**18 RESIDENCE ADDRESS** 3016 W. VAN BUREN, 2ND **APT. NO/FLOOR** 2ND **17 DISTING. MARKS, SCARS, DISABILITIES, ETC.** N/V

**18 SOCIAL SECURITY NO**

**CITY - STATE** CHICAGO IL **ZIP CODE** 60612 **HOME TELEPHONE** 312 533-9570 **20 STATE/PLACE OF BIRTH** OHIO **21 DRIVER'S LICENSE NO** J525-6337-4099

**12 RD NO** X-566805 **22 OCCUPATION** R+R MECHANIC **24 BUSINESS NAME - ADDRESS** JOHNSON TRANSMISSION CORP. **CITY - STATE** 4578 W. MADISON **ZIP CODE** 60642 **BUSINESS TELEPHONE** 312 378-3518

**25 ADDRESS OF ARREST** 1930 N. WESTERN **26 NO ARRESTED** 3 **27 LOCATION CODE FOR NAT'L OF ARRESTS** 303 **28 BEAT OF ARREST** 7424 **29 DATE OF ARREST** 05 DEC 93 **MONTH YEAR** **TIME** 2305 **30 ARRESTEE TRANSPORTED TO UNIT BY BEAT** H27 "H27 33

**31 RESISTED ARREST** **32 WEAPON** ☐ PISTOL ☐ REVOLVER ☑ RIFLE SHOT ☐ GUN ☑ KNIFE OTHER (SPECIFY): **33 PROPERTY INVENTORY NO(S)** 125 7154 **34 FOR NARCOTIC ARREST** ☐ SPEEDY ARREST ☐ SUSPECT CONTROLLED SUBSTANCE **SPARK WT. (ST. STREET VALUE)** NO BILL **CONTR.** **PAX 0-682** **5**

**35 VEHICLE** OF ARRESTEE **YEAR** 85 **MAKE** BUICK **MODEL** CENTURY **BODY STYLE** WAGON **COLOR** BLUE **STATE LICENSE NO OR V.I.N** RFZ456 **DISPOSITION OF VEHICLE** PARKED IN STATION LOT

**36 PERSON IN INVESTIGATIVE UNIT NOTIFIED** KUSNICK **UNIT NOTIFIED - TIME** A/4/VC 2335 **37 DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME** ☐ YES ☑ NO **IF YES - NAME OF Y O MEMBER NOTIFIED - TIME** **38 NAME OF A & PPEL. REV** **CHARGES APPROVED** ☐ YES ☐ NO **TIME**

**39 VICTIM/COMPLAINANT NAME** STATE OF ILLINOIS/LEGITTINO **SEX** M **RACE** **AGE** **HOME ADDRESS** E #2 31 Ø14TH DIST. **CITY - STATE** **ZIP CODE** **TELEPHONE NO** 312 744-829?

**VICTIM INJURED** ☐ YES ☐ NO **IF YES - DESCRIBE INJURIES** **VICTIM HOSPITALIZED** ☐ YES ☐ NO ☐ TREATED & RELEASED **HOSPITAL NAME**

| 40. REFERENCES (CH - PAR.) | 41 OFFENSES | 42 DISPOSITIONS | 40. REFERENCES (CH - PAR.) | 41 OFFENSES | 42 DISPOSITIONS |
|---|---|---|---|---|---|
| 1 | | | 5 | | |
| 2 | | | 6 | | |
| 3 | | | 7 | | |
| 4 | | | 8 | | |

**43. NARRATIVE** (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

IN SUMMARY: SUBJECT ARRESTED ON CHARGES LISTED IN THAT HE "AS OBSERVED BY A/O's COMMIT A TRAFFIC OFFENSE, DURING THE COURSE OF CURBING SAID VEHICLE A/O OBSERVED SUBJECT MAKE A SUDDEN GESTURE TOWARDS THE BACK SEAT CAUSING A/O's TO BECOME SUSPICIOUS. UPON APPROACHING SAID VEHICLE A/O SHINED A FLASH LIGHT INTO THE BACKSEAT AND OBSERVED TWO (2) SMALL CALIBER WEAPONS. THE OFFENDERS WERE PLACED UNDER ARREST, ADVISED OF THEIR RIGHTS PER MIRANDA AND TRANSPORTED TO Ø14 DISTRICT FOR PROCESSING.

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

**FIRST ARRESTING/APPEARING OFFICER'S SIGNATURE** **STAR NO -** **UNIT** **DEPUTY CLERK'S SIGNATURE** **STAR/EMPL. NO**

**44 FIRST ARRESTING APPEARING OFFICER - PRINT NAME** **BEAT NO** **FURLO** **D O GRP** **M/SO./DRD CRT KEY**

**45 FINAL APPROVAL OF PROBABLE CAUSE - SIG. - STAR** **46 RESULTS OF FINGER/BAR. CHECK WAIVED BY SIG - STAR** **47 SECOND ARRESTING OFFICER - PRINT NAME - STAR NO** LEGITTINO / TRENPE 8749 **UNIT** Ø14 17 **48. VEHICLE ASSIGNED** ☐ ONE ☐ TWO MAN ☐ OTHER **49. APPROVAL OF CHARGES - SIG. - STAR - DATE** **TIME**

**WATCH COMMANDER'S NOTATIONS**

**50 ARRESTEE SEARCHED BY** **STAR/EMPL. NO** **UNIT** **51 DATE RECEIVED - LOOKUP** **DATE** **52 PERS. PROPERTY RECEIPT NO** **53 TELEPHONE NO. CALLED** **TIME**

**54 BOOKING OFFICER** **STAR/EMPL. NO** **UNIT** **55 TIME FINGERPRINTED** **56 TIME PHOTOGRAPHED** **57 CELL NO.** **58 PLACED IN CELL NO.**

## COURT INFORMATION

| **59 A** | **DESIRED COURT DATE** | **BRANCH/CAL.** | **60 COURT SGT. TO HANDLE** ☐ YES ☐ NO | **61 INITIAL COURT DATE** | **BRANCH - CALL** | **62 FINAL CRT. DATE** | **BRANCH - CALL** |
|---|---|---|---|---|---|---|---|

| **63 BONDED - DATE** | **TIME** | **64 BOND RECEIPT NO** | **65 COURT DISPOSITION** | **66 FINAL JUDGE'S NAME** |
|---|---|---|---|---|

# CHICAGO POLICE
## ARREST REPORT
CPD-11.420 (REV 6/92)

**1. NAME (LAST - FIRST - MIDDLE)**
JOHNSON, ZUKIEL

**2. SEX** M **3. RACE** B **4. AGE** 18 **5. DATE OF BIRTH** DAY 20 MONTH SEP YEAR 75

**6. C.B. NO**

**7. ALIAS OR NICKNAME**

**8. DIST./BEAT./RES** 014 **9. HEIGHT** 5'09" **10. WEIGHT** 115 **11. HAIR** BLK **12. HAIRSTYLE** PUMP **13. EYES** BRN **14. COMPLEXION** MED

**15. I.R. NO.**

**16. RESIDENCE ADDRESS** 2149 W. DIVISION **APT NO./FLOOR** 3 REAR **17. DISTING. MARKS, SCARS, DISABILITIES, ETC.** N/V **18. SOCIAL SECURITY NO.** 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?

**19a. CITY / STATE** CHICAGO, IL **ZIP CODE** 606?? **HOME TELEPHONE** 312-292-9387 **20. STATE/PLACE OF BIRTH** ILLINOIS **21. DRIVERS LICENSE NO.** T525-9947-5915? **STA**

**22. AO NO** X

**23. OCCUPATION** STUDENT

**24. BUSINESS NAME - ADDRESS** LAKEVIEW HOSP 4015 N. ASHLAND CHGO IL **CITY - STATE  ZIP CODE** **BUSINESS TELEPHONE**

**21. ADDRESS OF ARREST** 1920 N. WESTERN

**26. NO ARRESTED** 3 **27. LOCATION CODE FORNATURE OF PREMISES** 204 **28. SEAT OF ARREST** **29. DATE OF ARREST** DAY 05 MONTH DEC 93 **TIME** 22?? **30. ARRESTEE TRANSPORTED TO (UNIT)** U-N-K

**31. RESISTED ARREST** **32. WEAPON** ☐ PISTOL ☑ REVOLVER ☐ RIFLE ☐ SHOT GUN ☐ KNIFE ☐ OTHER (SPECIFY) **33. PROPERTY INVENTORY NO(S)** 1257154 **34. FOR NARCOTICS USAGE** ☐ SUSPECT CANNABIS ☐ SUSPECT CONTROLLED SUBSTANCE **35. STREET VALUE** **NO. PKCS** **CALL ORG CRIME** **PKG TYPE**

**35. VEHICLE ARRESTEE** **YEAR** 85 **MAKE** BUICK **MODEL** CENTURY WAGON **BODY STYLE** **COLOR** BLUE RFZ4516 **DISPOSITION OF VEHICLE** PARKED IN STATION LOT

**36. PERSON IN INVESTIGATIVE UNIT NOTIFIED** RUSNICK **UNIT NOTIFIED** A/4/C 2335 **TIME** **37. DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME** ☐ YES ☐ NO **IF YES: NAME OF Y D MEMBER NOTIFIED - TIME** **38. NAME OF 2 S ARREL. REV** **CHARGES APPROVED** ☐ YES ☐ NO **TIME**

**39. VICTIM/COMPLAINANT** STATE OF ILLINOIS/REDDING **NAME** **SEX** F **RACE** **AGE** **HOME ADDRESS** 014TH DIST **CITY - STATE** **ZIP CODE** **TELEPHONE NO** 312-744-8290

**VICTIM INJURED** ☐ YES ☑ NO **IF YES : DESCRIBE INJURIES** **VICTIM HOSPITALIZED** ☐ YES ☑ NO ☐ TREATED & RELEASED **HOSPITAL NAME**

| 40. REFERENCES (CH - PAR) | 41 OFFENSES | 42 DISPOSITIONS | | 40. REFERENCES (CH - PAR) | 41 OFFENSES | 42 DISPOSITIONS |
|---|---|---|---|---|---|---|
| 1 | | | 5 | | | |
| 2 | | | 6 | | | |
| 3 | | | 7 | | | |
| 4 | | | 8 | | | |

**43 NARRATIVE** (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

IN SUMMARY:

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

**FIRST ARRESTING/APPEARING OFFICER'S SIGNATURE** **STAR NO** **UNIT** **SECOND ARRESTING OFFICER'S SIGNATURE** **STAR/EMP. NO**

**44. FIRST ARRESTING/APPEARING OFFICER- PRINT NAME** REDDING/BERNARD **STAR NO** 10175 **BEAT NO** 1427 **R-NO** 3 **S-NO** 1 **MISD ORD CRT #EV** **47. SECOND ARRESTING OFFICER - PRINT NAME** LEGITINO/TREMPE **STAR NO** 8749 **UNIT** 014 **48. VEHICLE ASSIGNED** ☐ ONE ☐ TWO ☐ PO ☐ PO ☐ OTHER

**45. INITIAL APPROVAL OF PROBABLE CAUSE: SIG - STAR** **46. RESULTS OF FINGERPR. CHECK WAIVED BY: SIG - STAR - DATE** **TIME** **49. APPROVAL OF CHARGES: SIG - STAR - DATE**

**WATCH COMMANDER'S NOTATIONS**

**50. ARRESTEE SEARCHED BY** **STAR/EMP. NO** **UNIT** **51. DATE RECEIVED - LOCKUP** **TIME** **52. PERS. PROPERTY RECEIPT NO** **53. TELEPHONE NO. CALLED - TIME**

**54. BOOKING OFFICER** **STAR/EMP. NO** **UNIT** **55. TIME FINGERPRINTED** **56. TIME PHOTOGRAPHED** **57. TIME PLU** **58. PLACED IN CELL NO**

## COURT INFORMATION

**59. A. DESIRED COURT DATE** **BRANCH - CALL** **60. COURT SGT. TO HANDLE** ☐ YES ☐ NO **61. INITIAL COURT DATE** **BRANCH - CALL** **62. FINAL CRT. DATE** **BRANCH - CALL**

**63. BONDED - DATE** **TIME** **64. BOND RECEIPT NO** **65. COURT DOCKET NO** **66. FINAL JUDGE'S NAME**

**ARREST REPORT**
CPD-11.420 (REV 6/83)

| 5. SEX | 3. RACE | 4. AGE | 5. DATE OF BIRTH DAY MONTH YR |
|---|---|---|---|
| M | 1 | 16 | 01 JUL |

7. ALIAS OR NICKNAME: "STRETCH"

6. DIST./RES: Ø14 | 9. HEIGHT: 600 | 10.WEIGHT: 130 | 11. HAIR: BLK | 12. HAIR STYLE: SHORT | 13. EYES: BRN | 14. COMPLEX: ME

16. RESIDENCE ADDRESS: RO19 N. LEAVITT | APT. NO./FLOOR: 2B | 17. DISTING. MARKS, SCARS, DISABILITIES, ETC.: N/V | 18. SOCIAL SECURITY NO.: UNK

CITY - STATE: CHGO. IL | ZIP CODE: 60622 | HOME TELEPHONE: 312 489-5529 | 20. STATE/PLACE OF BIRTH: IL | 21. DRIVERS LICENSE NO.: UNK

23. OCCUPATION: STUDENT | 24. BUSINESS NAME - ADDRESS: SENN HIGH SCHOOL | CITY - STATE ZIP CODE | BUSINESS TELEPHONE: UNK

25. ADDRESS OF ARREST: 1930 N. WESTERN | 26. NO. ARRESTED: 3 | 27. LOCATION CODE FOR NATURE OF PREMISE: 3Ø3 | 28. BEAT OF ARREST: 1424 | 29. DATE OF ARREST DAY MONTH YEAR: Ø5 DEC 99 | TIME: 2305 | 30. ARRESTEE TRANSPORTED TO UNIT: Ø14 | BY BEAT: 1427 2

31. RESISTED ARREST: NO | 32. WEAPON: PISTOL REVOLVER / RIFLE SHOT / GUN / KNIFE / OTHER (SPECIFY) | 33. PROPERTY INVENTORY NO(s): 125 1154 | 34. FOR NARCOTIC ARREST | APPR WT: EST STREET VALUE: $ DLLS - CALLORG CRIME | PAR B BY 2: A

35. VEHICLE OF ARRESTEE: YEAR 85 | MAKE BUICK | MODEL CENTURY WAGON | BODY STYLE: WAGON | COLOR: BLUE | STATE LICENSE NO OR VIN: RFZ456 | DISPOSITION OF VEHICLE: PARKED IN STATION LOT

36. PERSON IN INVESTIGATIVE UNIT NOTIFIED: RUSNICK | UNIT NOTIFIED: A/4/C | TIME: 2335 | 37. DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME: YES / NO | IF YES - NAME OF YD MEMBER NOTIFIED: TIME | 38. NAME OF A S A/FEL. REV | CHARGES APPROVED: YES / NO

39. VICTIM/COMPLAINANT: NAME: STATE OF ILLINOIS/LEGITTINO | SEX: F | RACE: Ø2 | AGE: 31 | HOME ADDRESS: Ø14 DIST. | CITY - STATE | ZIP CODE | TELEPHONE NO: 312 744-8:

VICTIM INJURED: YES / NO | IF YES - DESCRIBE INJURIES | VICTIM HOSPITALIZED: YES / NO / TREATED & RELEASED | HOSPITAL NAME

| 40. REFERENCES (CH - PAR) | 41 OFFENSES | 42 DISPOSITIONS | 40. REFERENCES (CH - PAR) | 41 OFFENSES | 42 DISPOSITIONS |
|---|---|---|---|---|---|
| 1 | | | 5 | | |
| 2 | | | 6 | | |
| 3 | | | 7 | | |
| 4 | | | 8 | | |

43. NARRATIVE (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

IN SUMMARY: SUBJECT ARRESTED ON CHARGE LISTED IN THAT HE WAS OBSERVED BY A/O's IN ABOVE DESCRIBED VEHICLE STOPPED FOR COMMITTING A TRAFFIC OFFENSE, DURING THE COURSE OF CURBING SAID VEHICLE, A/O's OBSERVED SUBJECT MAKE A SUDDEN GESTURE TOWARDS THE BACK SEAT CAUSING A/O's TO BECOME SUSPICIOUS UPON APPROACHING SAID VEHICLE, A/O SHINED A FLASHLIGHT INTO THE BACK SEAT AND OBSERVED TWO (2) SMALL CALIBER WEAPONS. THE OFFENDERS WERE PLACED UNDER ARREST, ADVISED OF THEIR RIGHTS PER MIRANDA ER AND TRANSPORTED TO Ø14 DISTRICT FOR PROCESSING.

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

FIRST ARRESTING/APPEARING OFFICER'S SIGNATURE | STAR NO. | UNIT | DEPUTY CLERK'S SIGNATURE | STAR NO

44. FIRST ARRESTING/APPEARING OFFICER - PRINT NAME | BEAT NO | FU/RO | O.O GRP | MISD./ORD CAT KEY | 45 SECOND ARRESTING OFFICER - PRINT NAME STAR NO | UNIT | 46. VEHICLE ASSIGNED: ONE / TWO / FO / PO / OTHER

INITIAL APPROVAL OF PROBABLE CAUSE: SIG - STAR | 48. RESULTS OF FINGERPRINT CHECK WAIVED BY: SIG - STAR | DATE | TIME | 49. APPROVAL OF CHARGES - SIG - STAR - DATE | TIME

WATCH COMMANDER'S NOTATIONS

50. ARRESTEE SEARCHED BY | STAR/EMPL. NO | UNIT | 51. DATE RECEIVED - LOCKUP | TIME | 52. PERS. PROPERTY RECEIPT NO | 53. TELEPHONE NO. CALLED | TIME

BOOKING OFFICER | STAR/EMPL. NO | UNIT | 55. TIME FINGERPRINTED | 56. TIME PHOTOGRAPHED | 57. TIME PRD | 58. PLACED IN CELL NO

COURT INFORMATION

59. A. DESIRED COURT DATE | BRANCH-CAL | 60. COURT SGT TO HANDLE: YES / NO | 61. INITIAL COURT DATE | BRANCH-CAL | 62. FINAL CRT DATE | BRANCH - CALL

BONDED - DATE | TIME | 64. BOND RECEIPT NO | 65. COURT DOCKET NO | 66. PRES. JUDGE'S NAME

**FIREARMS RECEIPT & WORKSHEET**
CRIME LABORATORY DIVISION/CHICAGO POLICE

| FIREARMS NO. | I-UCR CODE | RD NO. |
|---|---|---|
| F4  193 | 143A | X 566805 |

| CASE NAME | PROP. INVENTORY NO. | UNIT | DATE RECEIVED |
|---|---|---|---|
| ROBERT WILL HIT | 1257154 | 014 | 9 DEC 93 |

| TYPE | MAKE | MODEL |
|---|---|---|
| P/I | RAVEN ARMS | MP-25 |

| SERIAL NO. | LOCATION |
|---|---|
| 836806 | BACK STRAP |

| OTHER NO. | LOCATION |
|---|---|

| CALIBER/CLASS | CAPACITY | BARREL LENGTH | FINISH ☐BLUE ☑PLATE |
|---|---|---|---|
| 25AUTO- 6L | 6+1 | 2 1/2 | ☐S.S.  ☐OTHER |

| RECEIVED FROM | STAR NO. | UNIT | ☐EVID. VAULT ☐IN PERSON |
|---|---|---|---|
| P.O. REDDING | 10805 | 014 | ☐DEPT. MAIL |

OTHER EVIDENCE

(1) MAGAZINE

(5) 25AUTO CTGS

.DET MARCH

| RESIDUE IN BARREL | RESIDUE IN CYLINDER |
|---|---|
| ☐YES ☐NO | ☐YES ☐NO |

CONDITION OF BORE

SAFETY DEVICES ☐HAMMER ☐GRIP ☐FIR. PIN ☐M

| NO. TESTS | OPERATING CONDITION |
|---|---|

REMARKS

WEAPON IN OPERATIVE  FP BROKEN  19 Jan 94

EMWoman

| ALL EXHIBITS TURNED OVER TO - NAME | STAR NO. | DATE |
|---|---|---|
| ☐ERPS  ☐OTHER | | |

| RETURNED TO - NAME | STAR NO. | DATE |
|---|---|---|

| DATA PREPARED BY - NAME | STAR NO. | DATE |
|---|---|---|
| Jamis Leung | 561 | 14 DEC 93 |

CPD-33-400 (REV. 8/88)