UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. DARRYL WASHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 08 C 3521 |
| | ) | |
| GERARDO ACEVEDO, Warden, | ) | The Honorable |
| | ) | Ruben Castillo, |
| Respondent. | ) | Judge Presiding. |

## RESPONDENT'S ANSWER

Pursuant to this Court's June 30, 2008 order and Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, Respondent GERARDO ACEVEDO answers the instant petition for writ of habeas corpus, and requests that it be denied for the reasons described herein.

## BACKGROUND

1.      Petitioner Darryl Washington, whose prison identification number is K62037, is incarcerated at Illinois's Hill Correctional Center, where he is in the custody of respondent Gerardo Acevedo.

2.      Following a jury trial in the Circuit Court of Cook County, petitioner and co-defendant Pierre Willhite were each convicted of one count of first degree murder, one count of aggravated battery with a firearm, and one count of home invasion.  For their crimes, each defendant was sentenced to a cumulative term of 66 years in prison.  *See* Exh. A, Order of Sentence and Commitment, *People v. Washington*, No. 94-CR-25737 (Ill. Cir. Ct. Jan. 9, 1998); *see also* Doc. 6 at 26-44,

Rule 23 order, *People v. Washington*, Nos. 1-98-0225 & 1-98-0984 (consol.) (Ill. App. 1999), at 1.

## The Trial

3.     The joint jury trial of petitioner and Willhite took place over four days in 1997.  *See* Exh. B, Trans. of proceedings, *People v. Washington*, No. 94-CR-25737 (Sept. 3, 1997); Exh. C, Trans. of proceedings, *People v. Washington*, No. 94-CR-25737 (Sept. 4, 1997); Exh. D, Trans. of proceedings, *People v. Washington*, No. 94-CR-25737 (Sept. 5, 1997, morning); Exh. E, Trans. of proceedings, *People v. Washington*, No. 94-CR-25737 (Sept. 5, 1997, afternoon); Exh. F, Trans. of proceedings, *People v. Washington*, No. 94-CR-25737 (Sept. 8, 1997).

4.     As established by the testimony at trial,[1] eight people were gathered at the apartment of Elvis Valentin (2051 West Division Street in Chicago) at 6:30 p.m. on December 5, 1993: Elvis; Dalila Robles (Elvis's girlfriend); Obedina Valentin (Elvis's mother); Sylvia Ramos (Elvis's sister); Luis Cruz (Sylvia's boyfriend); and three of Elvis's nieces and nephews, who were between the ages of 11 months and six years.  *See* Exh. B at C-51 to C-52; *id.* at C-141 to 142.  Sometime before 7:30

---

[1]  The Illinois appellate court's summaries of pertinent facts are presumed to be correct, and petitioner may only rebut the appellate court's findings by introducing clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1); *see also, e.g., Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007).  Here, because petitioner challenges the strength and character of eyewitness testimony against him, respondent will describe the pertinent trial testimony to put petitioner's claims in context for the Court.

2

p.m., Elvis's neighbor Juan Lopez also arrived, to share dinner with the family. *Id.* at 178.

5.     At 6:30 p.m., Elvis and Dalila briefly left.  Elvis went to dispose of trash, and then followed the path Dalila had taken down the stairwell, where he came upon Dalila arguing with Pierre Willhite. *Id.* at C-55 to C-56.  Dalila had referred to Pierre as a "prieto," the Spanish word for a black man, and Pierre was offended. *Id.* at C-58 to C-60.  Because Pierre "kept getting aggressive," Elvis punched him in the jaw. *Id.* at C-63.  Pierre ran out of the building, warning that he would return. *Id.*

6.     Elvis asked his friends Edgar Perez and Edmund Green (who had been at the apartment building earlier but then left (*see* Exh. C at D-6 to D-7)) to come to the apartment "in case [he] needed help."  Exh. B at C-65 to C-66.  Edgar and Edmund arrived sometime before 7:30 p.m. *Id.* at C-66 to C-67.  Shortly afterward, there was a knock at the door, which Edmund answered. *Id.* at C-148 to C-149.

7.     In the ensuing commotion: Edmund was fatally shot in the head and fell down, *id.* at C-151; at least one man came into the apartment shooting, *id.* at C-153; Cruz, who was sitting at a bench eating dinner, was shot and wounded, *id.* at C-153 to C-154; Ramos rushed her daughter and mother into the pantry, while behind her she saw a man enter the apartment and fire a gun in her direction, *id.* C-175 to C-177; Elvis and Edgar ran into Elvis's room where Dalila was sleeping (*id.* at C-118) and barricaded the door with a dresser, *id.* at C-68 to C-69; and Juan

Lopez tried to open the back door of the apartment to escape, Exh. B at C-178 to C-179.  After at least ten shots had been fired, the gunfire ceased.  *Id.* at C-68.

8.     Three men were involved in the shooting, as evidenced by the three types of bullet casings found at the scene, which came from three different guns. Exh. C at D-104 to D-105, D-177, D-194.  Additionally, Edgar Perez's testimony established that three suspicious men were in the apartment building just prior to the shooting.  Specifically, Edgar testified that, after witnessing Elvis's altercation with Pierre around 6:30 p.m., he had seen Pierre run to a car and drive away.  Exh. C at D-11.  When Edgar returned later that evening, only minutes before the shooting, he witnessed the same car park near Elvis's building, and saw three men debark, one of whom he recognized as Pierre.  *Id.* at D-13 to D-14.

9.     Detectives came to view petitioner, along with Pierre, as suspects in the crime.  A detective testified that Luis Cruz, the surviving victim, gave the nickname of one of the perpetrators as "Gooch."  *See* Exh. G, Trans. of hearing on mot. to quash, *People v. Washington*, No. 94-CR-25737 (July 18, 1996), at A-34. Cruz also told detectives that during his investigation on the street, he had learned second-hand the nicknames of the other two men, "Scooter" and "Pierre."  *Id.* at A-35.  Because Gooch, Scooter, and Pierre were known members of the Imperial Vice Lords gang, the police had a file on "Scooter" — i.e., petitioner.  *Id.* at A-36 to A-39; *see also* Exh. D at E-137 (petitioner's mother refers to him as "Scooter").

10.     Using a photograph of petitioner that law enforcement had on file (dated January 31, 1991), detectives created a photo lineup.  Exh. G at A-39 (officer

4

describes process of preparing lineup); *see* Exh. B at C-220 (actual photo lineup introduced at trial).  On December 18, 1993, officers brought the lineup to Sylvia Ramos, who confirmed that petitioner looked like the man who had fired a gun at her, but stated that she "would have to see him in person to be sure."  Exh. G at A-39 to A-40 (officer's testimony); Exh. B at C-159 to C-160 (Ramos's testimony).

11.     In the 1991 photo, petitioner appeared different from how he looked in December 1993, because petitioner had been in an accident in June 1993 that scarred his nose.  Exh. B at C-191.  As Ramos testified, she consistently told officers that she recalled the shooter as "ha[ving] a mark on his nose," Exh. B at C-160, C-182; and, in the 1991 photo, petitioner's nose was unmarked.  *Id.* at C-220.

12.     Meanwhile, on January 12, 1994, Edgar Perez identified Pierre Willhite from a photo array as one of the shooters.  Exh. C at D-24.  He also noted that he recognized the photo of petitioner, because Pierre and petitioner "always walked together in the neighborhood.  Every time [Edgar had] seen them they were walking together. " *Id.* at D-25.

13.     Based on Ramos's photo identification, information that the perpetrator and petitioner were both nicknamed "Scooter," and information that petitioner and Pierre were associates, detectives issued an order to be on the lookout for petitioner.  Exh. G at A-40.  On a tip, officers went to the Wicker Park Field House on January 20, 1994, where they identified petitioner based on his clothing and arrested him following a foot-chase.  Exh. G at A-8 to A-13 (suppression hearing testimony); Exh. C at D-76 to D-77 (trial testimony).

14.    Once petitioner was in custody, on January 21, 1994, Ramos identified petitioner from an in-person line-up, this time with certainty.  Exh. B at C-87 to C-89 (Ramos's testimony); Exh. C at D-88 at D-89 (officer's testimony).

15.    At trial, Ramos again identified petitioner as the man who entered Valentin's apartment and fired a gun at her.  Exh. B at C-156 to C-157.  Defense counsel cross-examined her extensively on her identification.  *See id.* at C-182 to C-216.

16.    To counter Ramos's testimony that she informed officers on the night of the shooting that the perpetrator had a mark on his nose (Exh. B at C-182), defense counsel introduced the summary report prepared at the scene, in which Ramos's description of the perpetrator was summarized and the space for "scar or deformity" was marked "none visible."  Exh. D at E-18 to E-19.  Counsel also elicited testimony from an officer at the scene that Ramos never told him that the shooter "had a scar or mark on the tip of his nose."  *Id.* at E-25.

17.    In resolving the inconsistencies in this evidence, the jury necessarily found Ramos's identification credible, and determined that defendant was guilty beyond a reasonable doubt.

### Direct Appeal

18.    Petitioner appealed his conviction to the Appellate Court of Illinois, First Judicial District, alleging: (1) the trial court erred in not quashing his arrest and not suppressing as the fruit of that arrest Ramos's out-of-court identification; and (2) the prosecutor's closing argument was improper.  *See* Exh. H, Def. Br.,

*People v. Washington*, Nos. 1-98-0225 & 1-98-0984 (consol.); Exh. I, People Br.,

*People v. Washington*, Nos. 1-98-0225 & 1-98-0984 (consol.).  The appellate court

affirmed on June 14, 1999.  *See* Doc. 6 at 26-44.

19.    Petitioner had at most 35 days within which to file a timely petition for

leave to appeal (PLA) in the Illinois Supreme Court — or until July 19, 1999.  *See*

Ill. S. Ct. R. 315(b) (1999).[2]  On February 1, 2000, petitioner moved for leave to file

an untimely PLA.  *See* Exh. J, Mot. for leave to file late PLA, *People v. Washington*,

No. 88935.  In the PLA, he argued, *inter alia*, that the police had lacked probable

cause to arrest.  *See* Exh. K, PLA, *People v. Washington*, No.88935.  On April 5,

2000, the Illinois Supreme Court denied the PLA on its merits, apparently not

having determined whether the untimely petition was properly filed.  *See* Exh. L,

*People v. Washington*, 729 N.E.2d 503 (Table) (Ill. 2000).

20.    Petitioner petitioned for a writ of certiorari in the United States

Supreme Court, which was denied on June 12, 2000.  Doc. 6 at 2.

### State Postconviction Proceedings

21.    On June 5, 2000, petitioner filed a pro se postconviction (PC) petition

pursuant to 725 ILCS 5/122-1.  *See* Doc. 6 at 48-60, Pro se PC pet., *People v.*

*Washington*, No. 94-CR-25737.  As pertinent to the present action, petitioner

alleged: (1) trial counsel was ineffective for failing to investigate other possible

suspects, and (2) appellate counsel was ineffective for not challenging the admission

---

[2]  At that time, Illinois Supreme Court Rule 315 allowed a defendant 35 days
within which to file a PLA, if he filed an affidavit of intent to do so within 21 days.

of Sylvia Ramos's in-court identification.  In a supplement to the petition, he alleged that his sentence was unconstitutional under *Apprendi v. New Jersey*, 540 U.S. 446 (2000).  *See* Exh. M, First partial supp. to PC pet., *People v. Washington*, No. 94-CR-25737 (filed Jan. 2, 2001).

22.    Counsel appointed to represent petitioner filed a second supplement to the petition, in which she refined petitioner's claim that trial counsel was ineffective for failing to investigate and interview three individuals who were arrested in the vicinity of the crime scene on the night of the shooting, namely Nayati Johnson, Zuriel Johnson, and Robert Willhite.  *See* Doc. 6 at 61-66, Second partial supp. to PC pet., *People v. Washington*, No. 94-CR-25737.

23.    The State moved to dismiss the petition.  *See* Exh. N, Motions to dismiss PC pet., *People v. Washington*, No. 94-CR-25737 (filed Dec. 7, 2000; Nov. 8, 2001; Aug. 4, 2004).  After hearing argument (*see* Exh. O, Trans. of proceedings, *People v. Washington*, No. 94-CF-25737 (Jan. 11, 2005)), the circuit court dismissed the petition (*see* Doc. 6 at 67-78, Order dismissing PC pet., *People v. Washington*, No. 94-CR-25737 (Ill. Cir. Ct. Oct. 24, 2005)).

24.    Petitioner appealed the judgment of dismissal to the Appellate Court of Illinois, First Judicial District.  Petitioner's appointed counsel moved to withdraw under *Pennsylvania v. Finley,* 481 U.S. 551 (1987), on the ground that petitioner's appeal raised no issue of arguable merit.  *See* Exh. P, Mot. to withdraw, *People v. Washington*, No. 1-05-3601.  Petitioner objected to the motion (Exh. Q, Resp. to mot. to withdraw, *People v. Washington*, No. 1-05-3601), but the appellate court granted

8

the motion and affirmed the circuit court's judgment on October 26, 2007 (*see* Exh.

R, Rule 23 order, *People v. Washington*, No. 1-05-3601 (Ill.App. 2007)).

25.    Petitioner filed a PLA in the Illinois Supreme Court, alleging: (1) trial

counsel was ineffective for not investigating other possible perpetrators; and (2)

appellate counsel was ineffective for not challenging the admission of Sylvia

Ramos's identification.  *See* Exh. S, PLA, *People v. Washington*, No. 105833.  The

court denied his PLA on March 26, 2008.  *See* Doc. 6 at 79, Order denying PLA,

*People v. Washington*, No. 105833 (Ill. 2008).

### The § 2254 Petition

26.    Petitioner avers that he placed the instant petition for writ of habeas

corpus into the prisoner mail system on June 12, 2008.  Although petitioner has not

precisely complied with the requirements of Rule 3(d) of the Rules Governing

Section 2254 Petitions in the United States District Courts, in that he did not

certify that postage had been pre-paid, respondent will concede that June 12, 2008,

constitutes the date of filing.

27.    Because only 264 days of untolled time have elapsed since petitioner's

conviction became final, the instant petition is timely.  28 U.S.C. § 2244(d)(1)(A).

Specifically, 196 non-tolled days elapsed between July 19, 1999 (petitioner's

deadline for filing a timely PLA on direct review), and February 1, 2000 (date on

which petitioner moved for leave to file untimely PLA).  *See Fernandez v. Sternes*,

227 F.3d 977, 979 (7th Cir. 2000).  The limitations period was tolled from February

1, 2000, until petitioner's PLA was denied on June 12, 2000.  *See id.*  By this time,

petitioner had already filed a PC petition in the state court, and therefore the

limitations period was tolled until the Illinois Supreme Court denied his PLA on

collateral review — on March 26, 2008.  28 U.S.C. § 2244(d)(2) (limitations period

tolled during pendency of PC petition); *Jones v. Hulick*, 449 F.3d 784, 788 (7th Cir.

2006) (PC petition no longer "pending" once postconviction PLA is denied).  The

limitations period then ran until June 12, 2008, during which an additional 78 days

elapsed.

28.    In the instant petition, petitioner alleges three claims for relief:

(i)    Trial counsel was ineffective for failing to (a) investigate other
       individuals who may have committed the crime, and (b)
       subpoena medical records and witnesses to demonstrate that
       medical injuries precluded petitioner from participating in the
       shooting;

(ii)   The trial court erred in denying petitioner's motion to quash his
       arrest; and

(iii)  Petitioner's counsel on direct appeal of his conviction provided
       ineffective assistance for failing to challenge the admissibility of
       Ramos's testimony.

29.    Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the

United States District Courts, respondent is filing the following documents,

relevant to the issues raised in the petition, under separate cover:

Exhibit A:    Order of Sentence and Commitment, *People v. Washington*, No.
              94-CR-25737 (Ill. Cir. Ct. Jan. 9, 1998);

Exhibit B:    Trans. of proceedings, *People v. Washington*, No. 94-CR-25737
              (Sept. 3, 1997);

Exhibit C:    Trans. of proceedings, *People v. Washington*, No. 94-CR-25737
              (Sept. 4, 1997);

Exhibit D:    Trans. of proceedings, *People v. Washington*, No. 94-CR-25737 (Sept. 5, 1997, morning);

Exhibit E:    Trans. of proceedings, *People v. Washington*, No. 94-CR-25737 (Sept. 5, 1997, afternoon);

Exhibit F:    Trans. of proceedings, *People v. Washington*, No. 94-CR-25737 (Sept. 8, 1997);

Exhibit G:    Trans. of hearing on mot. to quash, *People v. Washington*, No. 94-CR-25737 (July 18, 1996);

Exhibit H:    Def. Br., *People v. Washington*, Nos. 1-98-0225 & 1-98-0984 (consol.);

Exhibit I:    People Br., *People v. Washington*, Nos. 1-98-0225 & 1-98-0984 (consol.);

Exhibit J:    Mot. for leave to file late PLA, *People v. Washington*, No. 88935;

Exhibit K:    PLA, *People v. Washington*, No. 88935;

Exhibit L:    *People v. Washington*, 729 N.E.2d 503 (Table) (Ill. 2000);

Exhibit M:    First partial supp. to PC pet., *People v. Washington*, No. 94-CR-25737;

Exhibit N:    Motions to dismiss PC pet., *People v. Washington*, No. 94-CR-25737 (filed Dec. 7, 2000; Nov. 8, 2001; Aug. 4, 2004);

Exhibit O:    Trans. of proceedings, *People v. Washington*, No. 94-CF-25737 (Jan. 11, 2005);

Exhibit P:    Mot. to withdraw, *People v. Washington*, No. 1-05-3601;

Exhibit Q:    Resp. to mot. to withdraw, *People v. Washington*, No. 1-05-3601;

Exhibit R:    Rule 23 order, *People v. Washington*, No. 1-05-3601; and

Exhibit S:    PLA, *People v. Washington*, No. 105833.

30.    Petitioner has filed five documents in this Court that respondent would otherwise be required to file pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts.  In the interest of efficiency, respondent will not duplicate these filings:

(i)    Rule 23 order, *People v. Washington*, Nos. 1-98-0225 & 1-98-0984 (consol.) (Ill. App. 1999) (*see* Doc. 6 at 26-44);

(ii)    Pro se PC pet., *People v. Washington*, No. 94-CR-25737 (*see* Doc. 6 at 48-60);

(iii)    Second partial supp. to PC pet., *People v. Washington*, No. 94-CR-25737 (*see* Doc. 6 at 61-66);

(iv)    Order dismissing PC pet., *People v. Washington*, No. 94-CR-25737 (Ill. Cir. Ct. Oct. 24, 2005) (*see* Doc. 6 at 67-78); and

(v)    Order denying PLA, *People v. Washington*, No. 105833 (Ill. 2008) (*see* Doc. 6 at 79).

## ARGUMENT IN OPPOSITION TO PETITION

## I.    Habeas Relief May Not Be Granted On Petitioner's Fourth Amendment Claim Because He Had A Full And Fair Opportunity To Litigate That Claim In State Court.

In a habeas action, review of a state prisoner's Fourth Amendment claim is limited to the issue of whether he had a "full and fair opportunity" to litigate the claim in the state courts.  *Stone v. Powell*, 428 U.S. 465, 481-82 (1976); *Cabrera v. Hinsley*, 324 F.3d 527, 530 (7th Cir. 2003).  Where a petitioner raises a Fourth Amendment claim in state court, he has a full and fair opportunity as long as three criteria are met:

(1) [he] . . . clearly informed the state court of the factual basis for [his] claim and . . . argued that those facts

12

> constitute a violation of his fourth amendment rights and
> (2) the state court . . . carefully and thoroughly analyzed
> the facts and (3) applied the proper constitutional case
> law to the facts.

*Hampton v. Wyant*, 296 F.3d 560, 563 (7th Cir. 2002).

Illinois provided petitioner with ample opportunities to litigate the lawfulness of his arrest, and he availed himself of all of them. He filed a motion to quash his arrest, and the trial court granted him an evidentiary hearing to develop his claim. *See* Exh. G. After petitioner failed to persuade that court, he appealed the trial court's decision to the Illinois appellate court (*see* Exh. H (Def. Br.)) and sought discretionary review in the Illinois Supreme Court (*see* Exh. K). These procedures are generally adequate to ensure that the state courts have fully considered a Fourth Amendment claim. *See Cabrera*, 324 F.3d at 532 (deeming suppression hearing and appellate review adequate state court procedures).

And, as *Hampton* requires, the Illinois appellate court both applied the proper law to petitioner's claim and carefully summarized the relevant facts. The court set forth the applicable law as follows:

> Whether probable cause exists is a commonsense, practical question to be determined upon examination of the totality of the circumstances presented. <u>People v. Robinson</u>, 167 Ill.2d 397, 405 (1995). To determine whether a warrantless arrest is based on sufficient probable cause, the trial court must decide whether a reasonable and prudent person, having knowledge possessed by the officers at the time of the arrest[,] would believe the defendant committed an offense. <u>People v. Lippert</u>, 89 Ill.2d 171, 178 (1982). The police need not possess evidence sufficient to convict, but need only have knowledge of facts which would lead a reasonable person

> to believe that a crime has been committed by the
> defendant.  <u>People v. Neal</u>, 111 Ill.2d 180, 193 (1985).
> Furthermore, when police officers are working together to
> investigate a crime or possible crime, probable cause may
> be established from their collective knowledge even if it
> was not within the personal knowledge of the arresting
> officer.  <u>People v. Hendricks</u>, 253 Ill.App.3d 78, 89 (1993).

(Rule 23 order, Doc. 6 at 35).  This correctly describes the federal standard for

probable cause.  *See, e.g., Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) ("the

probable-cause standard is a practical, nontechnical conception that deals with the

factual and practical considerations of everyday life on which reasonable and

prudent men, not legal technicians, act") (internal quotations omitted); *Illinois v.*

*Gates*, 462 U.S. 213, 230-31 (1983) (probable cause is based on the "totality of the

circumstances"); *Henry v. United States*, 361 U.S. 98, 102 (1959) ("[p]robable cause

exists if the facts and circumstances known to the officer warrant a prudent man in

believing that the offense has been committed").

The Illinois appellate court then carefully considered the facts that comprised

the totality of the circumstances in petitioner's case:

> At the time of the arrest, the police knew that a shooting
> had occurred, and that about an hour earlier there had
> been an altercation between Elvis Valentin and
> codefendant.  The police were told that three individuals,
> "Gooch," "Scooter" and "Pierre" were the shooters, and
> they frequented the Wicker Park field house.  The police
> identified Pierre as codefendant, went to Wicker Park,
> were given a description of the suspects, and were told
> that they often came to the field house.
>
> Detectives then contacted the local police district and
> asked for a name search in the nickname file for
> "Scooter."  They received defendant's name.  The police

14

> then obtained defendant's picture and showed it to one of
> the witnesses who identified defendant as one of the
> shooters.  Based on that information, the detectives
> submitted a "stop order" for defendant.  Next, detectives
> showed defendant's picture to another witness, who
> identified codefendant as the shooter and defendant as
> one of his friends.  A few days later, Officer Echeverria
> was on routine patrol in the Wicker Park area when he
> received a message which indicated that an anonymous
> caller had notified police that a murder suspect was in the
> Wicker Park field house, and was wearing a purple jacket
> with a cartoon character on it.  As the officers entered the
> field house, they saw defendant wearing this type of
> jacket.  When defendant saw the officers, he ran.
>
> To support his argument defendant contends that the
> anonymous tip was insufficient, and the identification by
> the witness was insufficient for the arrest.  However, all
> of the events taken together determine probable cause.
> . . . We find that the information collectively known by the
> police in this case was sufficient to establish probable
> cause for defendant's arrest.

Rule 23 order, Doc. 6 at 35-37.

Consequently, the requirements for a "full and fair hearing" were met.  And

because the Illinois appellate court's consideration of petitioner's claim was

adequate, the correctness of its ruling is irrelevant.  *See Cabrera*, 324 F.3d at 531

("Absent a subversion of the hearing process, we will not examine whether the

judge got the decision right."); *Hampton*, 296 F.3d at 564 ("a blunder, no matter how

obvious, matters only in conjunction with other circumstances that imply refusal by

the state judiciary to take seriously its obligation to adjudicate claims under the

fourth amendment").  However, in this case, the appellate court's decision was

demonstrably consistent with federal precedent, which holds that a single witness's

15

identification of a suspect is sufficient to establish probable cause. *See Tangwall v. Stuckey*, 135 F.3d 510, 520 (7th Cir. 1998).

In sum, because petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in the state courts, he is not entitled to habeas relief on this ground.

## II.    Petitioner's Claim That Trial Counsel Provided Ineffective Assistance Is Partially Defaulted And Lacks Merit.

Petitioner alleges that trial counsel provided ineffective assistance for two reasons: (1) counsel failed to adequately investigate petitioner's medical condition, and (2) counsel neglected to explore other potential suspects.  However, in the PC petition he filed in state court and the ensuing appeal from its dismissal, petitioner argued only that his counsel was ineffective for failing to investigate other suspects. Because he did *not* argue that counsel should have investigated his medical condition, this argument is procedurally defaulted.  On the remaining theory of ineffectiveness, petitioner is not entitled to relief because the Illinois appellate court reasonably rejected his ineffective assistance claim on the merits.  *See* 28 U.S.C. § 2254(d)(1).

### A.    Petitioner Defaulted That Portion Of His Ineffectiveness Claim Based On Investigating Medical Records.

Petitioner alleges here for the first time that his trial counsel should have subpoenaed medical records and taken other steps to investigate whether a medical condition precluded petitioner from participating in the crime.

16

Each argument that supports an ineffectiveness claim must be presented properly to the state courts, or it is procedurally defaulted. *See Bradshaw v. Richey*, 546 U.S. 74, 79 (2005) (failure to raise ground of ineffectiveness in state court results in "procedural default of these subclaims"); *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) ("the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default"); *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 555 (7th Cir. 2001) (allegations of ineffective assistance based on discrete failures of counsel "are independent" and may be defaulted if not raised in state court). Since petitioner did not present his argument that trial counsel was ineffective for failing to inquire into his medical history on direct appeal or in his PC petition (where he alleged that counsel was ineffective for other reasons), it is defaulted. *Stevens*, 489 F.3d at 894.

Conceivably, petitioner could excuse his default. To do so, he would need to demonstrate either: (1) cause for the default and prejudice resulting from it; or (2) a "fundamental miscarriage of justice." *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002). To establish "cause," petitioner would need to show that some external impediment blocked him from asserting his federal claim in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate "prejudice," he would need to show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Finally, to qualify for the fundamental

17

miscarriage exception, petitioner would need to demonstrate that the constitutional violation he asserts has probably resulted in the conviction of one who is "actually innocent." *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003).

Here, petitioner can meet none of these stringent standards.  First, petitioner cannot establish cause for defaulting the medical-record portion of his ineffective assistance claim.  Especially since petitioner argued that counsel was ineffective for other reasons, and his medical history was well-known to him at the time of his trial, petitioner has no conceivable excuse for omitting his medical-record argument from his PC petition.  Petitioner argues that the prosecutor withheld the allegedly exculpatory medical records, citing *Brady v. Maryland*, 373 U.S. 83 (1963) (*see* Doc. 6 at 15).[3]  As a general matter, State misconduct in withholding evidence necessary to substantiate a claim may constitute cause for default.  *See Crivens v. Roth*, 172 F.3d 991, 995-96 (7th Cir. 1999).  However, here there could be no misconduct sufficient to supply cause, because petitioner had independent knowledge of his own medical condition.  *See United States v. Dawson*, 425 F.3d 389, 393 (7th Cir. 2005)

---

[3] Petitioner does not allege a *Brady* claim as an independent ground for relief in his petition.  *See* Doc. 3 at 6-7 (listing grounds for relief).  To the extent that the petition could be construed to have alleged such a claim in the attached argument (*see* Doc. 6 at 9-20), the *Brady* claim should be rejected.  First, it was never presented to the state courts, and thus is procedurally defaulted. *See, e.g., Mahaffey v. Schomig*, 294 F.3d 907, 919 (7th Cir. 2002).  Second, the *Brady* claim is meritless, because petitioner had knowledge of his own medical condition and could have unearthed the medical records through his own diligence.  *See United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996) ("the government will not be found to have suppressed material information if that information also was available to a defendant through the exercise of reasonable diligence").

("*Brady* requires disclosure only of exculpatory material known to the government but not to the defendant."), *modified on reh'g on unrelated grounds*, 434 F.3d 956 (7th Cir. 2006); *Morris*, 80 F.3d at 1170. Furthermore, petitioner fails to adequately allege that the State possessed his medical records, and to rebut the obvious flaw in his argument: it is unlikely in the extreme that the State would possess petitioner's private medical records without an executed waiver or, at a minimum, petitioner's knowledge. In sum, this conclusory *Brady* allegation cannot provide cause. Finally, and importantly, there can be no *Brady* violation because petitioner and the State *both* had the opportunity to obtain the medical records (although it would have been easier for petitioner to do so). *United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996).

Second, petitioner cannot demonstrate prejudice from his default of this ineffective assistance argument. In an effort to establish the importance of these medical records, petitioner alleges that he was "cut in the left arm" on June 20, 1993, and was shot in the right shoulder on August 23, 1993. Doc. 6 at 3. But neither injury would prevent petitioner from holding a handgun and pulling the trigger on December 5, 1993. If there were any doubt, testimony by petitioner's own witness at trial established that petitioner was not unduly impeded by his injuries, since he was throwing a basketball on the day of the crime. *See* Exh. D at E-57. Pursuing this medical-condition argument would have been futile; indeed, such a strategy would have been counterproductive because it would have been belied by defendant's own witnesses. Presenting both contradictory positions would have

shown each to be a sham.  It follows that: (1) counsel was not imcompetent for

failing to investigate it further, *see Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir.

2002) ("It is often times a reasonable exercise of professional judgment to limit or

terminate further investigation when counsel determines that a particular

investigation would be fruitless."), and (2) counsel's failure to pursue the issue was

not prejudicial.  Consequently, petitioner's defaulted ineffective-assistance

argument lacks merit, and his default of it has not caused him prejudice.

Finally, petitioner has fallen far short of demonstrating that the medical

records demonstrate "actual innocence," especially since, notwithstanding his 1993

injuries, petitioner's own witness testified that petitioner was able to shoot a

basketball hours before the murder.  Because the medical records do not establish

that petitioner is "more likely than not" innocent, petitioner's default should not be

excused under the "fundamental miscarriage" doctrine, either.

## B.   The State Appellate Court Reasonably Held That Counsel's Investigation Into Other Suspects Was Not Constitutionally Deficient.

The remaining argument on which petitioner hinges his claim of ineffective

assistance — counsel's alleged failure to investigate three individuals who were

arrested in the vicinity of the crime on the night of the murder — was presented to

the Illinois courts, and their denial of the claim was neither contrary to, nor an

unreasonable application of, Supreme Court law.  Thus, petitioner is not entitled to

habeas relief.  28 U.S.C. § 2254(d).

The applicable Supreme Court law is set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (applying *Strickland* to assess state court determination that counsel provided effective assistance). As correctly stated by the state circuit court (whose judgment was summarily affirmed by the state appellate court):[4]

> In examining petitioner's claims of ineffective assistance of counsel, this court follows the two-pronged test of *Strickland* . . . . Under this standard, petitioner must show that counsel's representation fell below an objective standard of reasonableness, and that but for this deficiency, there is a reasonable probability that counsel's performance was prejudicial to the defense. . . . "Prejudice exists when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" . . . A petitioner's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats a claim of ineffectiveness. . . .
>
> Significantly, effective assistance of counsel in a constitutional sense means competent, not perfect, representation. . . . Notably, courts indulge in the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *Strickland*,

---

[4] Ordinarily, the state appellate court's order would constitute the "relevant decision" for purposes of assessing the reasonableness of its judgment, because here it was "the last state court to rule on the merits." *See Charlton v. Davis*, 439 F.3d 369 (7th Cir. 2006) (habeas court should assess decision of last state court to rule on merits); *see also Wilkinson v. Cowan*, 231 F.3d 347 (7th Cir. 2000) (appellate court's grant of *Finley* motion and affirmance of dismissal adjudicates merits of all postconviction claims). The appellate court, however, issued a summary affirmance, and the circuit court discussed at length its reasons for denying petitioner's claims. Since the appellate court affirmed the holding of the circuit court, respondent relies on the lower court's analysis. *Cf. Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002) (applying "last court rule" to situation in which two state courts *disagreed* on grounds for a particular holding, and holding that higher court's ruling controlled).

21

466 U.S. at 690 . . . .  Moreover, "the fact that another attorney might have pursued a different strategy is not a factor in the competency determination." . . .

Further, counsel's strategic decisions will not be second-guessed.  Indeed, to ruminate over the wisdom of counsel's advice is precisely the kind of retrospection proscribed by *Strickland* and its progeny.  *See Strickland*, 466 U.S. at 689 ("[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight."). . . .

Defense counsel's failure to adequately prepare for trial or to conduct adequate investigations may support an ineffectiveness claim. . . . However, "a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, [466 U.S. at 691].  Indeed, "to prevail on a claim of ineffective assistance for failure to investigate, petitioner must show that substantial prejudice resulted and that there is a reasonable probability the final result would have been different had counsel properly investigated."

Rule 23 order, Doc. 6 at 72-74.

Because the state circuit court cited *Strickland* and properly defined the governing standard — *see Strickland*, 466 U.S. at 687-88 ("[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness."); *id*. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") — its decision was not "contrary to" governing Supreme Court precedent.  *See Eckstein*, 460 F.3d at 851 (state court citing directly to *Strickland* test did not use contrary rule of law under § 2254(d)(1)).  The same reasoning extends to the state appellate court's decision, which implicitly adopted

22

the reasoning of the circuit court.  *See also* Exh. P at 8 (*Finley* motion cites

*Strickland* standard to state appellate court).

Furthermore, the appellate court's judgment that *Strickland* was not violated

was not unreasonable, *see Searcy v. Jaimet*, 332 F.3d 1081, 1089 (7th Cir. 2003)

(habeas court assesses reasonableness of state court's judgment, not its reasoning),

as explained by the circuit court below:

> Petitioner claims trial counsel was ineffective for failing
> to request police reports, interview witnesses or
> investigate the arrests of Nayati Johnson, Zuriel Johnson,
> or Robert Willhite for [unauthorized use of a weapon] in
> the alley behind the building at 2051 West Division Street
> in the early morning following the shooting.  According to
> petitioner, a police report that shows codefendant's
> brother was present outside 2051 W[est] Division Street
> is exculpatory.  He further alleges that these men were
> found to be in possession of two 25 caliber semi-automatic
> handguns [one of which] matched the exact description of
> one of the weapons used in [the] shooting. . . .
>
> Petitioner fails [to show deficient performance or
> prejudice].  First, petitioner fails to show how the police
> report was exculpatory of petitioner.  Rather petitioner
> surmises the police report could have implicated three
> others in the shooting.  He fails to connect how the
> presence of these three youths in the alley behind the
> crime scene hours after the shooting tends to absolve him of
> guilt especially when it turns out Robert Willhite is the
> brother of Pierre Willhite.  Indeed, nothing in the police
> report is inconsistent with the State's case.  This fact
> could indeed **inculpate** petitioner because it would link
> his codefendant more closely to the crime.  Counsel's
> choice not to rely on this police report and to confront the
> State's evidence is actually good trial strategy and cannot
> be deemed deficient from the allegations in the petition.
>
> Also, petitioner cannot show sufficient prejudice because
> there is not a reasonable probability the outcome of the

> trial would have been different if the jury had this
> evidence before them.  In fact, the jury could review this
> police report and believe that the codefendant's brother
> was near 2051 West Division Street to either recover guns
> used at the crime scene or to provide "back up" to Willhite
> and petitioner.  In any case, Petitioner fails to make a
> substantial showing of a constitutional deprivation.

Rule 23 order, Doc. 6 at 71-72, 74 (emphasis in original).

As the state courts reasoned, the fact that one of the individuals arrested at

the scene was a brother of petitioner's codefendant was highly inculpatory.  Robert

Willhite's possession of a gun allegedly used in the shooting makes it even more

probable that Pierre Willhite and his cohorts (including petitioner) were responsible

for the crime.  Defendant's speculation that these other individuals were

responsible for the shooting itself is not plausible: it is much more likely that the

actual shooters fled the scene immediately after committing first-degree murder in

an urban neighborhood with witnesses to overhear the gunshots, and discarded the

weapons used in the crime.  Finally, to the extent that Nayati Johnson, Zuriel

Johnson, and Robert Willhite were — like petitioner and Pierre Willhite —

members of the Imperial Vice Lords gang, this evidence would make it even more

probable that other members of the gang (such as petitioner) committed the crime,

and did so in an organized fashion complete with "clean up" assistance.[5]

---

[5] At petitioner's trial, the court excluded evidence of the codefendants' gang
membership, ruling that it was not relevant to establishing motive, which was
instead based on Pierre's personal altercation with Valentin.  *See* Exh. B at C-10 to
C-13.  Had the State presented the court with evidence that not only were the
codefendants members of the Imperial Vice Lords, but also other persons who
handled the gun used in the crime were members of the same gang, the court may

In sum, petitioner's assertion that his attorney performed deficiently for failing to investigate these other potential suspects lacks merit. *See Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) ("We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside.'") (quoting *Sacco v. Cooksey*, 214 F.3d 270, 275 (2d Cir. 2000)).

Additionally, defendant cannot credibly maintain that he was prejudiced by the omission of this evidence at trial. In addition to potentially inculpating petitioner by association, the evidence would have done nothing to impeach the key testimony against petitioner: Sylvia Ramos's consistent, unequivocal identification of petitioner as the man who fired a gun at her. This testimony establishes guilt beyond a reasonable doubt. *See McFowler v. Jaimet*, 349 F.3d 436, 456-57 (7th Cir. 2003) (not unreasonable to find evidence sufficient even though sole eyewitness's testimony was significantly impeached); *United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir. 1985) ("The testimony of one eyewitness, even if he is a member of the criminal class and has no intrinsic credibility, is enough to convict in the absence of contrary evidence[.]").

Regardless of whether the testimony of Sylvia Ramos appears unassailable on the basis of the cold record, it is the jurors' assessment of her credibility that governs. *See McFowler*, 349 F.3d at 456 ("inconsistencies and vulnerabilities in [a

---

well have ruled differently, since this evidence links Pierre and petitioner more strongly to the crime scene.

witness's] identification" resolved by factfinder); *United States v. Hopson*, 184 F.3d

634, 636 (7th Cir. 1999) (jurors are "free to believe" whatever evidence is submitted

to them, and their "credibility assessments and evidence-weighing" are entitled to

deference).  The jurors deemed Ramos credible, and this credibility determination

was dispositive.  There is no reasonable probability that their assessment of Ramos

would have changed, had they been presented with speculative theories about other

perpetrators: while other men may have been arrested in the alleyway behind 2051

West Division Street on the night of December 5, 1993, hours after the crime, Sylvia

Ramos *saw petitioner* invade Valentin's apartment wielding a gun and firing shots.

Thus, petitioner could not have suffered prejudice from the allegedly deficient

performance of counsel given the weight of the evidence against him.

At a minimum, the state courts' rejection of petitioner's *Strickland* claim was

not unreasonable, and habeas relief on this claim is unwarranted.  *See Barrow v.*

*Uchtman*, 398 F.3d 597, 605-06 (7th Cir. 2005) (error in applying *Strickland* must

be *unreasonable* to warrant relief).

## III.    The State Courts Reasonably Rejected Petitioner's Claim That Appellate Counsel Was Ineffective.

The state courts also reasonably rejected petitioner's claim that his appellate

counsel was ineffective for failing to challenge the admission of Ramos's in-court

identification of petitioner.[6]

---

[6]  Additionally, petitioner intimates that appellate counsel was ineffective for not raising a claim of "actual innocence."  Doc. 6 at 7.  This argument is defaulted because petitioner never raised it in his postconviction proceedings.  Moreover,

Like trial counsel, appellate counsel is subject to the *Strickland* standard.
*Howard v. Gramley*, 225 F.3d 784, 789-90 (7th Cir. 2000). Appellate counsel's
performance is deficient if she fails to raise a "significant and obvious issue" without
a legitimate strategic reason for doing so. *Id.* at 790. Failure to raise an issue only
amounts to ineffectiveness if the omitted claim would have resulted in a reversal or
an order for a new trial. *Id.* The state circuit court described the appropriate
standard, stating:

> To succeed on a claim of ineffective assistance of appellate
> counsel, petitioner must show that the failure to raise a
> particular issue was objectively unreasonable and that his
> appeal was prejudiced by the omission. . . . "Appellate
> counsel is not obligated to brief every conceivable issue on
> appeal, and it is not incompetence of counsel to refrain
> from raising issues which, in his or her judgment, are
> without merit, unless counsel's appraisal of the merits is
> patently wrong." . . . . Thus, petitioner has not suffered
> prejudice from appellate counsel's decision not to raise
> certain issues on appeal unless such issues were
> meritorious.

Rule 23 order, Doc. 6 at 76.

The state appellate court's affirmance of this holding denying petitioner's
claim was reasonable. Appellate counsel cannot be faulted for failing to raise non-

---

appellate counsel could not properly have raised such an argument on direct appeal,
and thus could not have been ineffective for failing to do so. A claim of actual
innocence (recognized by the Illinois State Constitution) must be supported by
newly discovered exculpatory evidence, and therefore is only properly brought in an
Illinois postconviction proceeding. *See People v. Washington*, 665 N.E.2d 1330, 1337
(Ill. 1996).

meritorious claims.  *See Schaff v. Snyder*, 190 F.3d 513, 527 (7th Cir. 1999).  And a challenge to Ramos's in-court identification would have been baseless.

Notably, petitioner does *not* appear to argue that appellate counsel was ineffective for failing to object to the admission of Ramos's two out-of-court identifications.  To the extent that the petition can be read to suggest that these earlier identifications tainted the in-court identification, the argument should be rejected.

As a preliminary matter, the two out-of-court identifications were properly introduced.  Such identifications are admissible unless (1) "the identification procedures were unduly suggestive"; and (2) the identification was not "sufficiently reliable to prevent misidentification."  *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003).  On the first point, there is no evidence that the photo array shown to Ramos was put together in such a way as to suggest that petitioner was the culprit.  Far from encouraging Ramos to select petitioner, the photo array actually worked to petitioner's advantage, since Ramos was confronted with a photo that looked demonstrably different from petitioner's appearance at the time of the crime.  And to the extent that the subsequent in-person lineup was "suggestive," since Ramos had seen petitioner's photo, it was unavoidably so.  The lineup was done specifically so that Ramos could satisfy herself that her earlier identification of petitioner was correct.  In any event, "there is nothing per se impermissible about placing the same suspect in two different identification procedures."  *United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002); *accord United States v. Griffin*, 493

28

F.3d 856, 865 (7th Cir. 2007) ("viewing a physical lineup after a photo array, with both containing the defendant, is not on its own unduly suggestive").

On the second point, even if there were a defect in the procedures used, Ramos's out-of-court identifications of petitioner were independently reliable. *Gregory-Bey*, 332 F.3d at 1054.  An identification's reliability depends on:

> "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation."

*Id.* at 1045 (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).  Ramos watched petitioner advance from fifteen feet away, under circumstances that required the utmost attention.  *See* Exh. B at C-150 (Ramos 15 feet from the door), C-154 (petitioner fired gun in her direction).  The description that Ramos provided on the night of the crime is consistent with petitioner's appearance, in particular because she informed responding detectives that the intruder had a distinguishing mark on his nose.  *Id.* at C-182.  Ramos viewed the photo of petitioner only thirteen days after the shooting, and the line-up one month after that.  Finally, Ramos's decision to identify petitioner emphatically only upon viewing him in person — where the mark on his nose was visible — strongly supports the reliability of her identification.  She was, indeed, a careful and deliberative witness.  In sum, Ramos's out-of-court identifications of petitioner were properly admitted at trial.

Consequently, petitioner may not challenge Ramos's in-court identification on the ground that her earlier identifications tainted her ability to accurately identify petitioner in the courtroom. Moreover, even assuming some defect in the prior procedures (which, as demonstrated above, there was none), the in-court identification would be independently admissible. "Eyewitnesses should be prevented from identifying a suspect in court only if the pretrial procedure 'was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Williams*, 522 F.3d 809, 810 (7th Cir. 2008) (quoting *Simmons v. United States*, 390 U.S. 377, 348 (1968)). To be "irreparable," it is necessary that "the source of the error [be] so elusive that it cannot be demonstrated to a jury." *Williams,* 552 F.3d at 811. Here, however, defense counsel extensively cross-examined Ramos on the certainty and the consistency with which she identified petitioner. Any "error" was amply demonstrated to the jury, which nevertheless favored Ramos's identification.

Petitioner appears to contend that Ramos's in-court identification was defective because she initially expressed confusion. He argues that Ramos "twice identified Mr. Pierre Willhite . . . as the shooter" at trial (Doc. 6 at 9), and the record does support an inference that Ramos initially was somewhat confused. When first asked to identify the shooter, Ramos apparently pointed at Pierre. *See* Exh. B at C-155 (record does not state Ramos pointed at Pierre but counsel's continued questioning of her supports this inference). However, she thereafter clarified with no apparent hesitancy that petitioner was the man she meant to

30

identify.  First, she testified that the man with whom she had seen Elvis arguing —

whom she had identified to be Pierre (Exh. B at C-144 to C-145) — was *not* the

shooter she had seen.  *Id*. at C-156.  Second, Ramos clarified that she wanted to

identify the man in the gray sweater (i.e., petitioner), and not the man in the suit

(i.e., Pierre).  Thus, the record reflects that Ramos identified petitioner — not

Willhite — as the shooter.  *Id*. at C-157.

Petitioner's argument that Ramos's identification was therefore "bogus" does

not impugn its admissibility, but its weight.  In petitioner's opinion, Ramos's

confusion weakened her identification.  However, it is the jurors' assessment of the

evidence that governs (*see McFowler*, 349 F.3d at 456), and they determined that

Ramos's in-court identification was credible.  This finding is entirely reasonable,

furthermore, given Ramos's two previous out-of-court identifications of petitioner.

In sum, a challenge to Ramos's identification would not have been

meritorious.  Thus, appellate counsel was not incompetent for failing to raise the

issue, and petitioner was not prejudiced by counsel's failure to pursue it.  The state

court's determination that petitioner's appellate counsel provided effective

assistance pursuant to the *Strickland* standard was not unreasonable.  Thus,

habeas relief on this claim also should be denied.

31

## CONCLUSION

This Court should deny the instant petition for writ of habeas corpus.


August 20, 2008                              Respectfully submitted,

                                             LISA MADIGAN
                                             Attorney General of Illinois

                             By:      /s/ Erin M. O'Connell
                                     ERIN M. O'CONNELL, Bar #6283650
                                     Assistant Attorney General
                                     100 W. Randolph Street, 12th Floor
                                     Chicago, IL 60601-3218
                                     PHONE: (312) 814-1235
                                     FAX: (312) 814-2589
                                     EMAIL: eoconnell@atg.state.il.us


32

## CERTIFICATE OF SERVICE

       I certify that on August 20, 2008, I electronically filed respondent's **Answer** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, and on the same date mailed a copy of this document via the United States Postal Service to the following non-CM/ECF user:

            Darryl Washington, #K62037
            Hill Correctional Center
            600 South Linwood Road
            P.O. Box 1700
            Galesburg, IL 61402.

                              /s/ Erin M. O'Connell
                              ERIN M. O'CONNELL, Bar #6283650
                              Assistant Attorney General
                              100 W. Randolph Street, 12th Floor
                              Chicago, IL 60601-3218
                              PHONE: (312) 814-1235
                              FAX: (312) 814-2589
                              EMAIL: eoconnell@atg.state.il.us